284:85 Fed 289
35 LRA 602

ANDREW D. BISHOP

*v.*

THE AMERICAN PRESERVERS' COMPANY.

*Filed at Ottawa April 1, 1895—Rehearing denied October 25, 1895.*

1. EVIDENCE—*when secondary evidence of an agreement is admissible.* Secondary evidence of an agreement is admissible where its existence is established, and the original draftsman and custodian testifies that he has caused search to be made for it and it cannot be found, and it is shown to be beyond the jurisdiction of the court and in the possession or under the control of the adverse party, who, after being notified, declines to produce it.

2. CONTRACTS—*public policy—combination of all interests in a certain business, void.* An agreement providing for the welding together of all the interests engaged in a certain business, into one giant combination or partnership, under the absolute dominion and control of a board of trustees, is void, as contrary to public policy.

3. CORPORATIONS—*cannot form partnership.* A corporation cannot enter into partnership.

4. SAME—*status of foreign corporation controlling business transferred to it by a resident.* A foreign corporation, in so far as it is doing business in Illinois through any control which it exercises over a business transferred to it by a resident of Illinois, is subject to the same restrictions and duties as corporations formed in the State, and cannot operate as a member of a partnership of corporations.

5. REPLEVIN—*by foreign corporation to secure property illegally transferred.* Replevin cannot be maintained by a foreign corporation to secure from the seller property transferred to it under an illegal trust agreement, as the law will leave both parties where they were under the agreement.

6. SAME—*when agency of defendant will not remove taint of illegality.* The fact that such seller has been placed in control of the property by such foreign corporation, as its agent, will not authorize replevin, where such relation of principal and agent grew directly out of the illegal transaction, and had for its object the accomplishment of the unlawful purpose.

*Bishop* v. *American Preservers' Co.* 51 Ill. App. 417, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. SAMUEL P. McCONNELL, Judge, presiding.

This is an action of replevin begun on May 11, 1891, by appellee against appellant to recover the possession of certain goods and chattels, consisting of the stock in trade and machinery and equipments, belonging to and connected with the business of manufacturing fruit butters, jellies, preserves·and like products, and selling and dealing in the same.   The declaration consisted of three counts, the first being for goods wrongfully taken, the second for goods wrongfully detained, and the third being a count in trover.   An order was subsequently entered discontinuing the cause as to the last count.   The pleas were *non cepit, non detinet,* property in defendant, and a fourth plea, setting up that on, to-wit, the 1st day of March, 1888, the defendant was doing business in Chicago, under the name of the Michigan Fruit Butter Company, and was sometimes styled A. D. Bishop & Company · and was engaged in the manufacture of fruit butters, jellies, preserves and like products, and that the greater proportion of the goods mentioned in the declaration were then and there the property of the defendant and used by him in carrying on his said business, and that the residue of said articles was subsequently bought by the defendant in carrying on his said business under his said name of the Michigan Fruit Butter Company; that in March, 1888, Benjamin Fenton and B. E. Ryan approached the defendant and laid before him a scheme to form a "trust," to be called the American Preservers' Trust, to be organized for the purpose of bringing into one combination all manufacturers throughout the United States of fruit butters, jellies, preserves and like products, which the defendant avers are staple articles of food, and are in general use and demand by the inhabitants of the State of Illinois and of the United States, and for the further purpose of raising the price of said products, to prevent competition and to secure a virtual monopoly thereof, and to crush out any manufacturer who would not join said trust, and the defendant then and there refused to enter

into such combination; that then and there said Fenton told the defendant that unless the defendant joined the trust the same would ruin his business; that upon, to-wit, the 20th day of May, 1888, said B. E. Ryan, the now secretary of the plaintiff and a confederate of said Fenton, came to the defendant and stated to him that all the leading manufacturers of said products in the United States had signed, or agreed to sign, a trust agreement, and that if any manufacturer did not sign said agreement he would be forced out of business and his business ruined, and the defendant, fearing that said threats would be carried into execution, on, to-wit, the 20th day of May, 1888, signed a trust agreement.  (The plea then states the substance of the agreement which is hereinafter set out in full, and then proceeds as follows:)

"That at the time when the defendant signed the said trust agreement, to-wit, in May, 1888, said B. E. Ryan, one of the trustees mentioned in the trust agreement, caused an inventory to be made of the defendant's merchandise and equipment, and appraised the same at the sum of $9063.03, and informed the defendant that he would have to assign and transfer the same, by bill of sale, to the American Preservers' Trust, and that, at the time and place last aforesaid, the said B. E. Ryan directed the defendant to open a new set of books in the name of the American Preservers' Trust; that pursuant to said scheme, to-wit, upon the 20th day of June, 1888, the said trustees caused, or attempted to cause, a pretended corporation to be organized under and by virtue of the laws of West Virginia, under the name and style of the American Preservers' Company, with a capital of $600, which corporation is the plaintiff in this suit; that the incorporators were the said A. R. Bremer, B. E. Ryan, Henry Williams, B. Fenton, C. A. Max Wiehle and F. R. Jennings, all of whom were trustees of the said American Preservers' Trust; that subsequently, to-wit, in July, 1888, said Ryan came to the said defendant's said place of busi-

ness in said city of Chicago, and stated to the defendant
that in order to carry out the scheme of said trust it was
necessary for the defendant to execute a bill of sale of
his business, inventoried as aforesaid, to the American
Preservers' Company, said pretended corporation organ-
ized under the laws of West Virginia by said trustees for
the purpose of forming a channel through which said
trust could purchase and control the business of the
defendant and purchase and control the entire manufac-
ture and sale of fruit butters, jellies, preserves and like
products, and then and there, at the time above men-
tioned, said Ryan handed to the defendant a certain bill
of sale already drafted, running to the said pretended
American Preservers' Company, as vendee of the articles
inventoried as aforesaid, and then and there directed the
defendant to execute the same as part and parcel of
said scheme for the organization of said trust, which the
said defendant then and there, under the compulsion and
threats of said Ryan, executed, and also then and there
said Ryan handed to the defendant 331 shares of stock
in said American Preservers' Company, of the pretended
par value of $33,100, and directed the defendant to assign
said shares to the trustees of said trust, which the defend-
ant, under said direction and by compulsion and threats,
then and there did; that at the time of the execution of
said bill of sale said Ryan took said certificates of stock
so assigned under the direction and compulsion of the
said Ryan, and handed the defendant, to-wit, 662 certifi-
cates of trust in said American Preservers' Trust, at the
pretended par value of $66,200, which certificates were
known as American Preservers' Trust certificates, and
the defendant avers that said bill of sale to said Ameri-
can Preservers' Company was procured to be made by the
said company to aid said American Preservers' Trust, as
one of the agents and instruments employed and con-
trolled by the trustees of said American Preservers'
Trust in controlling the entire manufacture and sale of

said products, and that the pretended title acquired by the plaintiff under said bill of sale is the only title the said plaintiff acquired or had to the goods and chattels in said declaration described, and to the articles named in said bill of sale, or to the property and good will of the defendant's business, and that the procuring of the execution of said bill of sale was part of said scheme for the organization of said trust and the prevention of competition in the manufacture and sale of said products, for the raising of the market price of the same, and for securing a virtual monopoly therein, under the control of the American Preservers' Trust; that the trustees of the American Preservers' Trust and the plaintiff, by their agents, after procuring the defendant to sign said trust agreement and execute said bill of sale to plaintiff, permitted and required the defendant to carry on the said business under his own firm name and style, to-wit, 'The Michigan Fruit Butter Company,' or 'A. D. Bishop & Co.,' and to account to and make returns thereof to the plaintiff, or to said trustees of said American Preservers' Trust; that it was not intended by the incorporators that said American Preservers' Company should have an independent existence as a corporation, but that the said plaintiff company submitted itself to be used, and was used, as a mere channel through which the trust acquired title to the interests of individuals, partnerships and corporations engaged in the manufacture of said staple articles of food, and to this end the majority or controlling interest in shares of stock in said American Preservers' Company were issued by the plaintiff to the said trustees of the American Preservers' Trust; that in December, 1888, the defendant tendered his trust certificates to the general manager of the trust, and demanded that said trust return to him the articles inventoried in said bill of sale, which said general manager, B. E. Ryan, then and there refused to do, whereupon the defendant refused to make any reports to the trust until March, 1889, when

the defendant again presented his trust certificates to said trustees for cancellation, and demanded the return of the property and business so taken from him, and thereupon the president of said trust called upon the defendant, and by threats induced the defendant to continue making reports of business until the first of March, 1891, and that in April, 1891, a representative of said trust came to the defendant and asked the defendant to return said trust certificates, and to take in lieu thereof 221 shares of stock in said American Preservers' Company, stating that all the members of the said trust were going into said American Preservers' Company, which the defendant refused to do, because the defendant avers that the said American Preservers' Company was a mere agent of said trustees in and about the organization of said trust, and that he states the fact to be that the said trustees sought to avoid the appearance that said trust was a partnership of corporations, by canceling said trust certificates and abandoning the charters of the various corporations organized by the said trust, except the charter of the American Preservers' Company, and intending to give to the stockholders in the corporations whose charters were to be abandoned, shares of stock in said American Preservers' Company, to be held in trust by the said trustees of the American Preservers' Trust, as trustees for the stockholders of the American Preservers' Company, for which purpose said trustees of said trust caused the capital of the plaintiff to be increased, thereby substituting said American Preservers' Company in the place of said American Preservers' Trust, and the defendant avers that said trust, whether under the name of the American Preservers' Trust or of said American Preservers' Company, is a combination organized for the purpose of raising the price of staple articles of food and preventing competition therein, and securing a virtual monopoly thereof, and is contrary to public policy and void in law, for which reason the defendant then and there

157—19

refused to return the said certificates of trust; that upon, to-wit, March 1, 1891, the defendant was advised that said trust agreement was illegal, and since said time has refused to render any reports to said trust. All of which acts and doings of the plaintiff the defendant avers are contrary to public policy and void in law, and so the defendant, in fact, saith that the goods in the first and second counts mentioned, at the time when, etc., were the property of him, the defendant, and not of the plaintiff, wherefore," etc. Here follows usual conclusion to pleas in bar in replevin.

The fourth plea was demurred to but the demurrer was overruled, and plaintiff replied to said fourth plea. The second replication sets up that long prior to the commencement of the action the plaintiff was the sole and absolute owner of the property in question; that in July, 1888, the defendant, in consideration of 331 shares of the capital stock of the plaintiff, transferred his entire business property to the plaintiff, and that the defendant continued to manage the business as the agent of the plaintiff until, to-wit, April 1, 1891, at which time he claimed ownership of the property in question, without this, etc. The third replication says that, after the time of the alleged trust agreement mentioned in the plea as having been made, the defendant, in consideration of 331 shares of the capital stock of the plaintiff, then and there delivered by the plaintiff to the defendant, sold therefor his goods and chattels and machinery, etc., and that the defendant acted as the agent of the plaintiff, and received and bought goods and chattels mentioned in the declaration, as the agent of the plaintiff, until, to-wit, April 1, 1891, at which time the defendant attempted to repudiate his agency and asserted title to the property, and refused to account to the plaintiff, and that the property then in the hands of the defendant was the property originally sold, together with the additions and improvements made by the defendant, as plaintiff's agent; without this, that

the plaintiff purchased or held said goods as agent of said trust, or acted as tool or agent of said trust. The fourth replication to the third plea says, that on, to-wit, June 20, 1888, the plaintiff was legally incorporated by virtue of the laws of West Virginia, and became thereby, and has continued, a legal corporation, and since its incorporation has increased its stock to $2,500,000, and that subsequently to the incorporation of the plaintiff, to-wit, in July, 1888, in consideration of 331 shares of the capital stock of the plaintiff, the defendant sold his machinery, stock of goods and business for manufacturing mince meats, etc., and after that the plaintiff entered into an agreement with the defendant, whereby the defendant was to carry on the business as the agent of the plaintiff; that he did so up to April, 1891, and the additions and improvements made in said time were made by the defendant as the agent of the plaintiff, and that in April, 1891, the defendant, disregarding his duties, refused to recognize the title of the plaintiff; that the plaintiff was organized and continued to exist as an independent corporation, having no connection with the American Preservers' Trust, without this, etc.

Upon the trial of the cause the defendant offered in evidence a copy of the agreement mentioned in the fourth plea, after introducing evidence tending to account for the non-production of the original agreement and to establish a foundation for the introduction of secondary proof. The copy as offered is as follows :

"Whereas, it is designed to form a trust, to be known as the 'American Preservers' Trust,' for the purpose of securing intelligent co-operation in the business of manufacturing preserves, jellies, fruit butters, mince meat, and all articles of commerce connected therewith or relating thereto, and of selling and dealing in the same in home and foreign markets, and of doing all business relating and incidental thereto :

"Therefore it is mutually agreed by all who may sign this agreement, or become at any time the holders of the certificates of trust herein provided for, as follows:

"*First*—Until otherwise provided, the trust herein created shall be vested in nine trustees.

"*Second*—C. A. Max Wiehle, Max Ams, A. R. Bremer, B. E. Ryan, B. Fenton and F. R. Jennings are hereby appointed trustees, to hold their office until the first day of April, A. D. 1890, or until their successors are elected and qualified, and the six trustees aforesaid are hereby directed, authorized and empowered to select and appoint the other three trustees, to hold their office until the said first day of April, A. D. 1890, or until their successors are elected and qualified.

"*Third*—The trustees shall prepare certificates which shall show the interest of each beneficiary in said trust, and deliver them to the persons entitled thereto. The certificates shall be divided into shares of the par value of $100 each, and shall be known as the 'American Preservers' Trust certificates.' The trustees shall have full power to agree upon and direct the form and contents of said certificates, and the mode in which they shall be executed, attested and transferred. The certificates shall contain an express stipulation that the holders thereof shall be bound by the terms of this agreement, and by the by-laws herein provided for.

"*Fourth*—No certificate shall be issued except for property, bonds, stock, money or businesses, as hereinafter provided; and the certificates issued shall represent, as nearly as possible, the value or earning capacity of the property, bonds, stocks, money or businesses held by the trustees in trust. The certificates shall be the best evidence of the amount of interest of the beneficiaries in the trust. No duplicate certificates shall be issued by the trustees except upon surrender of the original certificates and cancellation of the same, or upon satisfactory

proof of the loss thereof, and the giving of a satisfactory bond of indemnity.

"*Fifth*—Each subscriber hereto agrees to assign and transfer, absolutely, to said trustees, as many as he shall own of the shares of the capital stock of the particular corporation or corporations indicated in article 6 of this agreement, whether said corporation now exists or is hereafter to be organized, in consideration of which said trustees do hereby agree to execute and deliver to each subscriber trust certificates, as above specified, equal to the appraised amount of the earning capacity of said stock. The appraised amount shall be determined by the parties in interest and said trustees. The value of the capital stock of any corporation whose stock it is contemplated will be assigned to said trust shall be first agreed upon between said trustees and the stockholders willing to transfer the same, and after it is agreed upon there shall be no discrimination in the purchase price thereof as between stockholders of the same corporation transferring their shares at the same time.

"*Sixth*—This agreement shall take effect within sixty days from the time those holding a majority of the stock in the following corporations, formed or to be formed, to-wit, J. O. Schimmel Preserving Company, Buffalo Conserve Company, Max Ams Preserving Company, A. R. Bremer Preserving Company, Ryan Brothers' Preserving Company, Charm Preserve Company, Indianapolis Preserving Company, have transferred the same to said trustees. Thereafter the said trustees and their successors shall have power to purchase other stocks and bonds of the same companies, or of companies organized for or engaged in conducting the same business or any of the businesses hereinbefore specified, and to purchase the property or business of any company, association, partnership or individual engaged in any of said businesses, and may issue therefor certificates of trust, equal, at par value, to the appraised amount of the earning capacity

and value to the trust of said stocks, bonds, property and businesses so purchased, or shall have power to lease the premises of such companies, partnerships, associations or individuals, paying therefor such rental as they may deem proper, whenever, in their judgment, it is for the best interests of the trust to lease rather than purchase.

"*Seventh*—All stocks and bonds sold and transferred to said trustees shall be held by them and their successors for the benefit of all the owners of said trust certificates. No stocks so held by said trustees shall be sold or surrendered by said trustees during the continuance of this trust, without the consent of a majority, in number and value, of the holders of trust certificates: *Provided, however*, that said trustees may, from time to time, assign such shares of stock as may be necessary to qualify any person or persons chosen, or desired to be chosen, as directors of any companies the stock of which are held by said trustees. Bonds and other property held by said trustees may be sold by them.

"*Eighth*—That said trustees shall have power to cause corporations to be formed for the purposes, and with all or any of the powers specified in the purposes, of this agreement: *Provided*, that the stock of such corporation shall be issued for cash or for property at its cash value, and shall be issued to or be purchased by said trustees in the manner provided in section 6 of this agreement.

"*Ninth*—Said trustees shall receive and safely keep all moneys received from dividends or interest upon stocks, bonds or moneys held in trust, and shall distribute the same, as well as all moneys received from sales of trust property, by declaring and paying dividends upon said trust certificates, as funds accumulate which are not needed for the uses and expenses of the trust. The trustees shall, however, keep separate accounts of receipts from dividends and interest, and of receipts from sale of trust property, and in declaring any dividends in which moneys derived from sales of trust property are included,

shall render the holders of trust certificates a statement showing what amount of the fund distributed was derived from such sales or transfers.

"*Tenth*—The trustees shall render to the holders of trust certificates, at each annual meeting, a statement of the receipts and disbursements, and of the affairs of the trust for the year.    They shall also, whenever demanded by a majority, in value, of the holders of trust certificates, furnish a true and complete inventory and appraisement of all property held in trust, and a statement, as full as possible, of the financial affairs of the various companies whose stocks are held in trust.

"*Eleventh*—Said trustees shall exercise supervision, so far as their ownership of stock shall enable them to do, over the several corporations or associations whose stock is held by said trustees.    As stockholders of said corporation they shall elect, or endeavor to elect, honest and competent men as directors and officers thereof, who may be paid a reasonable compensation for their services. They may elect themselves as such directors and officers, and shall endeavor to procure such judicious and efficient management of such corporations as shall be most conducive to the interest of the holders of trust certificates.

"*Twelfth*—All of the powers of the trustees can be exercised by a majority vote of their full number, either in person or by proxy, except in the election of officers, as provided in the by-laws :    *Provided*, that no proxy to represent a trustee can be given to or be voted by any person other than a trustee.    The said trustees may appoint from their own number an executive committee, and may appoint other committees composed wholly or in part of persons not of the board of trustees, and delegate to such committees such of their powers as they may deem advisable.    A majority of each committee may exercise all the powers conferred upon such committee.    Whenever the trustees, by resolution, shall determine to increase the number of trustees, a copy of said resolution, together

with the call for a meeting of certificate holders to vote thereon, shall be sent to every certificate holder whose address is known to the secretary. At least thirty days' notice of said meeting shall be given. If a majority, in value, of certificate holders at said meeting vote to increase the number of trustees, the board of trustees shall appoint the additional trustees thus created, as in case of a vacancy, and whenever the trustees shall, by resolution, determine to diminish the number of trustees, a copy of said resolution, thirty days prior to the annual meeting, shall be mailed to each certificate holder, and they shall vote on such proposition at said annual meeting, and if agreed to, the trustees, or the number by which it shall be determined to reduce, shall not be elected at said meeting: *Provided,* the board of trustees shall never be reduced to less than five, and not reduced at any annual election by more than three to be at said meeting elected.

"*Thirteenth*—The trustees may employ and pay all such agents and attorneys as they may find it necessary to employ in the management of said trust.

"*Fourteenth*—Until after April 1, 1889, no trustee shall receive a salary for his services as trustee. After that date each trustee shall receive a salary, not to exceed the sum of $6000 per annum, the amount of which salary shall be fixed, from time to time, by the certificate holders at their annual meetings. This provision is not intended to prohibit any of the trustees, prior to or after April 1, 1889, from receiving salaries, the amount whereof shall be fixed by the board of trustees, for services as president, secretary, treasurer, manager, or in other capacities than a trustee only. The whole or any part of the foregoing provision, to-wit, provision 14, may be modified by any by-law now or hereafter adopted by the certificate holders.

"*Fifteenth*—The board of trustees shall have its principal office in the city of Pittsburgh, subject to change by a vote of the trustees, at which office, or in a place of

safe deposit adjacent thereto, the stocks held in trust shall be kept.

"*Sixteenth*—All powers and duties vested in the trustees herein named shall vest in and be exercised by the successors of said trustees appointed as herein prescribed.

"*Seventeenth*—Election for trustees to succeed those herein appointed, and authorized to be appointed after the expiration of the term for which they have been appointed, shall be held annually. At the annual election in 1890 three trustees shall be elected to hold their office for one year, three to hold their office for two years, and three to hold their office for three years. Thereafter three trustees shall be elected annually to take the place of those retiring, to hold their office for three years, except those elected to fill a vacancy from any cause except expiration of term, who shall be elected for the balance of the term of the trustees whose places they are elected to fill. Every trustee shall hold his office until his successor is elected and qualified.

"*Eighteenth*—For their acts as trustees the trustees shall not be personally liable or responsible, except for willful misconduct or neglect.

"*Nineteenth*—Trustees shall be elected by ballot, by the owners of trust certificates or their proxies. At all meetings the owners of trust certificates who shall be registered as such on the books of the trustees may vote in person or by proxy, and shall have one vote for each and every share of trust certificates standing in their names; but no such owner shall be entitled to vote upon any share which has not stood in his name thirty days prior to the day appointed for the election. The transfer books shall be closed for thirty days prior to the day appointed for the annual election. A majority of the shares represented at such election shall elect.

"*Twentieth*—The annual meeting of the owners of said trust certificates for the election of trustees, and for other

business, shall be held at the office of the trustees on the Wednesday nearest the 15th day of March of each year, and said meetings may be adjourned from day to day until its business is completed. Special meetings of the owners of trust certificates may be called by a majority of the trustees, at such times and places as they may appoint. It shall also be the duty of the trustees to call a special meeting of the holders of trust certificates whenever requested so to do by a petition signed by the holders of twenty-five per cent in value of such certificates. The business of such special meetings will be confined to the objects specified in the notice given therefor. Notice of the time and place of all meetings of the owners of trust certificates shall be given by mailing a notice to the address of each certificate holder, so far as known, at least ten days before such meeting, and by public notice in one of the principal papers of the city where the office of the said trust may be located, ten days before said meeting.

"*Twenty-first*—At any meetings by-laws may be made, amended and repealed, by not less than two-thirds, in value, of the holders of trust certificates: *Provided, however*, that said by-laws shall not be inconsistent with any by-laws which have been or may be adopted by the holders of trust certificates, nor with this trust agreement.

"*Twenty-second*— Whenever a vacancy occurs in the board of trustees, from any cause other than the expiration of the term of office, the remaining trustees may adopt a trustee to fill the vacancy until the next annual meeting, or, at their option, may call a meeting of the owners of trust certificates, for the purpose of electing a trustee to fill the vacancy or vacancies.

"*Twenty-third*—If, for any reason, at any time, a trustee or trustees shall be appointed by any court to fill a vacancy or vacancies, the trustee or trustees so appointed shall hold their or his office or offices only until his

or their successor or successors shall be appointed or elected in the manner above provided for.

"*Twenty-fourth*—It shall be obligatory upon all trustees to attend each and every meeting of the board of trustees, either in person or by proxy; and in the event of any trustee absenting himself from three successive meetings, or failure to be represented by proxy at such meetings, then, in such case, the office held by said trustee shall be considered vacant, and the vacancy be filled as hereinbefore provided.

"*Twenty-fifth*—Whenever any change shall occur in the board of trustees, the legal title to the stock and other property held in trust shall pass to and vest in the successors of said trustees without any formal transfer thereof; but if, at any time, such formal transfer shall be deemed advisable or necessary, said formal transfer shall be made, and it shall be the duty of the board of trustees to obtain the same, and it shall be the duty of any retiring trustee, or the executor or administrator of any deceased trustee, to make such transfer.

"*Twenty-sixth*—This trust shall continue for the period of twenty-five years : *Provided, however*, that if, at any time after the expiration of one year, seventy-five per cent of all the holders, in value, of trust certificates, or after the expiration of five years sixty-five and two-thirds per cent of the holders, in value, of trust certificates, shall, at a meeting of certificate holders called for that purpose, vote to terminate the trust, they may, at the same or at a subsequent meeting called for that purpose, decide, by a vote of fifty-one per cent of their number, the mode in which the affairs of the trust shall be wound up, and whether it shall be sold and the value thereof distributed, or whether part, and if so, what part, shall be delivered and what part shall be sold, and whether such sale shall be public or private. To the parties whose property, stock or business shall have been transferred to said trust, shall be given the first privilege

of purchasing the stock, property or business by them transferred. The trustees, who shall continue to hold their offices for that purpose, shall wind up the affairs of the trust in the mode agreed upon by the holders of trust certificates, as aforesaid.

"*Twenty-seventh*—The trustees shall have power to do whatever is necessary and proper for carrying into execution the foregoing powers and the purposes for which this trust was organized.

"*Twenty-eighth*—Should any party or parties holding certificates of this trust, or being a lessor, be desirous of operating an establishment controlled by this trust, the party or parties shall make application to the board of trustees for such privilege, stating in said application the kind and estimated time during which he or they may desire to operate such an establishment; also the estimated quantity of goods he or they may desire to produce; then, should said specified establishment be not already in operation, the said privilege may, in their discretion, be granted by the said board of trustees on the following general terms and conditions :

"1. The party or parties to whom such privilege may be granted shall pay, monthly, into the treasury of the trust, a profit on all goods manufactured in such privileged establishment. Said profit shall equal at least the average profit which the trust has derived during such month from all the establishments operated by it for the period of time as covered by such privilege.

"2. The party or parties privileged shall bear all expense incidental to putting that establishment in condition to operate, and furnish all capital needed to operate the same.

"3. The party or parties privileged shall furnish to the trust ample and satisfactory surety for the payment, monthly, of the above mentioned profits.

"4. The trust shall, at all times, retain control over such establishment, and shall cancel such privilege when-

ever they may deem proper, or whenever, in the opinion of the trustees, it has operated to the prejudice of the best interests of the trust.

"*Twenty-ninth*—The trust certificates may be of the following form, but may be changed, from time to time, by the trustees, in accordance with provision 3 of this agreement:

"No...... Shares of $100.00 each. Shares.
"AMERICAN PRESERVERS' TRUST.

"This is to certify that...............entitled to......shares in the equity to the property held by the trustees of the American Preservers' Trust, transferable only on the books of said trustees on surrender of this certificate. This certificate is issued upon condition that the holder, or any transferee thereof, shall be subject to all the provisions of the agreement creating said trust, and of the by-laws adopted in pursuance of said agreement, as fully as if...............had signed the said trust agreement.

"Witness the hands of the president and secretary of the board of trustees, this.......day of............A. D. 188.., at the city of Pittsburgh.

....................................., *President.*

..................................., *Secretary.*"

(Back):

"For value received................hereby sell and transfer to ...............shares of the American Preservers' Trust standing in my name on the books of said trust, and......hereby irrevocably appoint...... ...........attorney to make the necessary transfer upon the books of said trust, in accordance with the regulations thereof and upon the conditions expressed upon the face of this certificate.

"Dated..............................., 188..

"In presence of.....................................

"*Thirtieth*—The trustees, whenever the value of stock, bonds, property or business which have accumulated in their hands, shall have increased in value, or when money not necessary for the uses of the trust shall have accumulated in their hands, may increase the amount of trust certificates to the extent of such increase or accumulation, and divide the same among the certificate holders."

The court refused to admit the copy of the agreement, and, after the introduction of testimony by both plaintiff

and defendant, excluded all the evidence of the defendant, and said to the jury:

The court: "Gentlemen of the jury, it becomes necessary to relieve you of this case. Of course, that may be small consideration to you for having sat here for a day or so to hear it; but at the same time, there was no evidence introduced on the part of the defendant which shows this American Preservers' Company, the plaintiff in this case, to have been in an illegal combination. It may have been so, but we can't find it so from this testimony. There is only one cause here shown, and as it is a *prima facie* case for the plaintiff I am going to instruct you as follows: 'The court instructs the jury that the defendant, Bishop, has failed to make out a defense, and that the plaintiff, the American Preservers' Company, has made out a *prima facie* case. You are therefore instructed to find for the plaintiff, the American Preservers' Company, and your verdict should be in the following form: We, the jury, find the issues for the plaintiff, and find the property described in the writ in the plaintiff, and assess the plaintiff's damages at one cent.' I will ask one of you to sign that, as foreman. You are doing that under compulsion, and you need not feel that it is your verdict, as it is a mere form." (The defendant, by his counsel, then and there duly excepted.) "You are simply doing what the court tells you to do. It is not as if you went out and found such a verdict; but at the same time we have to go through this form."

The defendant asked six written instructions to be given to the jury but they were all refused. The jury returned a verdict in accordance with the written instruction given by the court, and judgment was rendered in favor of the plaintiff for one cent damages, after the overruling of a motion for a new trial. The Appellate Court has affirmed the judgment of the circuit court, and the present appeal is prosecuted from such judgment of affirmance.

ARND, EVANS & ARND, for appellant:

The only right of the plaintiff to recover in this cause is based upon a contract contrary to public policy. *Hall* v. *White*, 106 Mass. 399; *Richardson* v. *Reed*, 4 Gray, 441; Story on Agency, 195-344; *Samuels* v. *Oliver*, 130 Ill. 73; Wells on Replevin, 77.

The court below committed reversible error in refusing to admit secondary evidence of the trust agreement to go to the jury. 21 Am. & Eng. Ency. of Law, 985; *Manning* v. *Marony*, 87 Ala. 563; *Hyam* v. *Edwards*, 1 Dall. 2; 1 Taylor on Evidence, sec. 438; 1 Wharton on Evidence, (3d ed.) sec. 82; *Gordon* v. *Searing*, 8 Cal. 49; *Shepard* v. *Giddings*, 22 Conn. 283; *Gordon* v. *Tweedy*, 74 Ala. 232; *Deitz* v. *Regnier*, 27 Kan. 107.

The American Preservers' Trust was illegal, because there can be no succession among trustees of an unincorporated company. *Warren* v. *Stearns*, 19 Pick. 77.

The trust agreement itself was illegal. *Arnott* v. *Coal Co.* 68 N. Y. 559; *Case of Monopolies*, 11 Coke, 84; *Coal Co.* v. *Barclay Coal Co.* 68 Pa. St. 173; *Salt Co.* v. *Guthrie*, 35 Ohio St. 666; *Craft* v. *McConoughy*, 79 Ill. 346; *Hilton* v. *Eckersley*, 6 E. & B. 74; *Lumber Co.* v. *Hayes*, 76 Cal. 387; *American Preservers' Co.* v. *Taylor Manf. Co.* 46 Fed. Rep. 152; *People* v. *North River S. R. Co.* 22 Abb. N. C. 164; *More* v. *Bennett*, 140 Ill. 69; *Mitchell* v. *Reynolds*, 1 P. Wms. 181.

An agent who obeys a principal's command to do an illegal act is liable, and cannot shift the liability on the principal. *Elmore* v. *Brooks*, 6 Heisk. 49; *Samuels* v. *Oliver*, 130 Ill. 73; *Daniels* v. *Barney*, 22 Ind. 207.

MORAN, KRAUS & MAYER, for appellee:

The agreement having been executed, the parties having submitted to its terms are clearly entitled to the benefit of the consideration stipulated, regardless of the fact that that same contract, if executory, would not have been enforced. Ray on Contractual Lim. 143, 147, and

authorities cited; *Planters' Bank* v. *Union Bank,* 16 Wall. 483; Greenhood on Public Policy, rule 69.

The mere motive and intention of parties forming a corporation cannot be inquired into. If the purpose of a corporation, as indicated by its articles of association, is legal, and the incorporation is effected in the manner prescribed by law, the intention of the incorporators is immaterial. Morawetz on Private Corp. sec. 758; *Vinegar Co.* v. *Schlegel,* 22 N. Y. Sup. 407; *Importing Co.* v. *Locke,* 50 Ala. 332.

It does not lie in the mouth of one who has contracted with an incorporated company, to plead, in a suit growing out of that contract, that the corporation was never legally incorporated, or was incorporated for illegal purposes. *Dows* v. *Naper,* 91 Ill. 45; *McCarthy* v. *Lavasche,* 89 id. 270; *Renwick* v. *Hall,* 84 id. 163; *Hudson* v. *Greenhill Seminary,* 113 id. 618; *Winget* v. *Building Ass.* 128 id. 67; Cook on Stockholders, (2d ed.) 712.

The bill of exceptions is the pleading of the party filing the same, and is to be taken against him, and, unless error is made to appear, the action of the trial court must be presumed to be correct. *Alley* v. *Limbert,* 35 Ill. App. 592; *Garrity* v. *Hamburger Co.* 136 Ill. 499; *Spahn* v. *People,* 137 id. 538.

A. LEO WEIL, also for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

Upon the trial of the case below, the plaintiff, the appellee here, introduced in evidence a certificate of incorporation, signed by the Secretary of State of West Virginia and dated June 20, 1888, declaring six corporators therein named to be a corporation by the name of "American Preservers' Company;" and also a bill of sale, executed on July 24, 1888, by the appellant to said company, granting to it, in consideration of the transfer to

him of 331 shares of its stock, the goods, effects and chattels described in an annexed schedule, and his business and the good will of the same, with the appurtenances. The plaintiff then examined one B. E. Ryan, the secretary and general manager of said company, and who was also the secretary of the "American Preservers' Trust" and one of the trustees of said trust. Ryan testified that he made demand upon appellant for the property before bringing this suit; that he received the bill of sale from appellant and delivered to him a certificate for 331 shares of the stock of said company, but, at the same interview and "within an hour or two," took back said shares and delivered to appellant 662 certificates of trust of the "American Preservers' Trust;" that as secretary of the company he delivered the 331 shares of stock; that as secretary of the trust he delivered the trust certificates; that he received back the 331 shares of stock as an officer of the trust; and that, at the same interview and upon receipt of the bill of sale, he then and there appointed appellant manager and custodian of the property described in the bill of sale, with directions to conduct the business and report to him, Ryan, all the purchases and sales and receipts and disbursements. After the examination of Ryan, the plaintiff rested.

The defendant then offered to introduce evidence, oral and written, tending to sustain the averments of his fourth plea. Some of this evidence was rejected when offered, some of it was admitted when offered, but all of it, upon motion of the plaintiff, was finally ruled out, and the jury were instructed to find the issues for the plaintiff. We cannot notice all the objections to specific offers of testimony, nor pass upon the rulings of the court in detail. We deem it sufficient to consider the general ground upon which the action of the trial court was based, and the general theory, which the defendant sought to· maintain by his offered and rejected testimony.

157—20

The court below seemed to take the view, that the plaintiff was an independent and legally organized corporation, and that, as the defendant had executed a bill of sale of his property and business to that corporation, and then assumed to act as its custodian and agent in the management of the property and business, he was estopped from denying the plaintiff's title or right of possession.

On the other hand, it was claimed by the defendant below, that a combination was formed among all the manufacturers of and dealers in fruit butters, jellies, preserves and like products in the United States under the name of the "American Preservers' Trust," for the purpose of controlling the manufacture and sale of said products, and preventing competition therein, and raising the market price thereof, and thereby securing a monopoly therein; that this combination was organized, and sought to effect its purpose, under and in pursuance of a written agreement signed by the parties to the combination; that the plaintiff company was formed in accordance with the provisions of this agreement and for the purposes of accomplishing the objects of the trust; that those objects were illegal and against public policy; that the agreement was illegal and void, as providing for a combination in restraint of trade in staple articles of food in general use and demand by the inhabitants of Illinois; and that the transfer of defendant's goods and machinery and business by means of a bill of sale to the plaintiff, and the delivery of the shares of stock to defendant, and the re-delivery thereof to the trustees of the combination in exchange for trust certificates, and the appointment of defendant as custodian of the property and agent to carry on the business theretofore exclusively his own, were all parts of the illegal scheme and aids in the accomplishment of the unlawful objects of the trust.

We are inclined to think that the claim thus made by the defendant, and which is set up in his fourth plea, would have constituted a good defense to the action, if he had been allowed to establish it by proper evidence.

*First*—A preliminary question arises as to the action of the trial court in excluding the offered copy of the trust agreement. The original agreement was not in the possession of the defendant, and it is claimed that a proper foundation was not laid for the introduction of secondary evidence. Proof of the contents of a document may be established by secondary evidence when it is in the possession of the adverse party who withholds it at the trial, provided that a notice to produce the original has been duly served where such notice is requisite. (1 Taylor on Evidence, part 2, sec. 440; 21 Am. & Eng. Ency. of Law, pages 984, 985). Secondary evidence may be offered to prove the substance of a document which it is out of the power of the party to produce; and this rule applies to papers out of the jurisdiction of the court, provided due effort be made to obtain such papers. (1 Wharton on Evidence, sec. 130; 21 Am. & Eng. Ency. of Law, page 986). The notice to produce the original may be given either to the adverse party himself or to his attorney. (21 Am. & Eng. Ency. of Law, page 989).

In the case at bar, notice to produce the original agreement and the by-laws of the company and of the trust was served upon the attorneys of the plaintiff, including Mr. A. L. Weil hereinafter named. Subpœna *duces tecum* was also served upon Ryan, the secretary and manager of the company and secretary and manager of the trust, and upon A. R. Bremer, president of the company and one of the trustees of the trust. Ryan swears, that he was present and saw the defendant, Bishop, sign the trust agreement, and that, after it was signed, it was put into the hands of "the custodian of the agreement, the solicitor of the trust, A. Leo Weil, this gentleman here," and that he saw it within a day or two thereafter. Weil,

a resident of Pittsburgh in Pennsylvania, where the principal office or place of business of the plaintiff was required by its charter to be kept, and whose name was signed to the replications as one of the plaintiff's attorneys, and who assisted in the conduct of the trial, was examined as a witness at the trial, and swore, that Bishop signed the agreement; that there were two copies of the agreement; that one was deposited with a safe deposit company in Pittsburgh; that the other was in his possession in accordance with the terms of the agreement; that the trust had been dissolved; that a large number of papers had been left in Pittsburgh when it was dissolved; that he had caused search to be made in his office at Pittsburgh to obtain these papers and had been unable to find them; and that the by-laws were attached to the trust agreement. Ryan and the defendant do not speak of more than one original agreement as having been signed by the defendant, but, if there was a duplicate original, it sufficiently appears that both were within the control of Weil, who drew the agreement, and was the legal adviser and solicitor both of the plaintiff and of the trust, in which plaintiff was an associate member.

Prior to the trial a bill in chancery had been filed by one Meyer in the circuit court of Cook county against the president and secretary of the plaintiff, Bremer and Ryan, and other parties, setting up the trust agreement, and Ryan had filed an answer thereto, admitting the existence of the trust agreement in words and figures as pleaded in the bill. The defendant below, upon the trial, offered in evidence the said bill and answer, as showing a copy of the trust agreement which had been admitted to be correct by the plaintiff, or its officers and managers. This copy was shown to the defendant when he testified, and he swore that he signed the original agreement in the latter part of May, 1888; that Ryan and Weil were present; that he "never saw it but that once;" that, when he saw it, it was lying on the table, and Ryan was very

particular about it, and ("I think") took it in his hands; that they would not let him make a copy of it; that he could not compare any copy of it with the original without having the original, and never had the original except at that time; that he read it through, but there was a great deal of it, and he could not remember its entire language; that the copy shown him, set out in said bill, "is a copy of the agreement I signed as near as I can tell." It furthermore appears from the testimony of Mr. Weil, that during the trial he had a copy of the trust agreement in his possession which he had found in the office of the plaintiff company, but he declined to produce it.

We are referred by counsel for appellee to the case of *Dickinson* v. *Breeden*, 25 Ill. 186. There, it was held, that, where a party, desiring to introduce secondary evidence of the contents of a deed, had knowledge of the grantee's residence, the latter's deposition should be taken to prove the existence of the original, and that it was lost, or so mislaid that it could not be found after diligent search. We cannot see why the facts of the present case do not bring it within the doctrine of the *Breeden* case. The existence of the original trust agreement was established by the testimony of three witnesses; and the original draftsman of the agreement and the custodian to whose possession it had been entrusted, was examined orally as a witness, and swore that he had caused search to be made for it, and that it could not be found. But if the evidence was not conclusive-as to the loss or destruction of the original, the defendant showed that it was beyond the jurisdiction of the court and in the possession or under the control of the plaintiff, and that the latter, after being notified, declined to produce it. We are, therefore, of the opinion that the trial court erred in not receiving in evidence the offered copy, if it would have been material testimony when introduced.

*Second*—It is contended, however, by counsel for appellee, that, "even had a proper foundation been laid and

proper secondary evidence of the alleged trust agreement been offered, its reception would have established no material fact, and its rejection was not error." Hence, the next matter presented for consideration relates to the pertinency or materiality of the agreement, and of the other excluded evidence offered in connection with it.

There can be no doubt, that this trust agreement is an illegal contract as providing for such a combination in restraint of trade as is forbidden by public policy.

In *Craft* v. *McConoughy*, 79 Ill. 346, where certain firms made an agreement, by the terms of which they attempted to form a combination for stifling competition and controlling the price of grain, cost of storage and expense of shipment, and thereby monopolizing the entire grain trade of the town and surrounding country, we said: "That the effect of this contract was to restrain the trade and commerce of the country, is a proposition that can not be successfully denied. We understand it to be a well settled rule of law, that an agreement in general restraint of trade is contrary to public policy, illegal and void."

In *People ex rel.* v. *Chicago Gas Trust Co.* 130 Ill. 268, we held, that an agreement, tending to prevent competition and create a monopoly, is void by the principles of the common law, because it is against public policy; and that public policy favors competition in trade to the end that its commodities may be afforded to the customer as cheaply as possible, and is opposed to monopolies, as tending to advance market prices to the injury of the general public.

Again in *More* v. *Bennett*, 140 Ill. 69, we held that contracts restraining the freedom of trade, or diminishing competition, or regulating the prices of commodities or services, are prohibited by the law; and that all combinations of capitalists or of workmen for the purpose of influencing trade in their especial favor by raising or reducing prices are so far illegal, that agreements to

combine cannot be enforced by the courts. To the same
effect are *Case of Monopolies*, 6 Coke, pt. 11, p. 84; *Arnott* v.
*Coal Co.* 68 N. Y. 559; *Morris Run C. Co.* v. *Barclay C. Co.* 68
Pa. St. 173; *Ohio Salt Co.* v. *Guthrie*, 35 Ohio St. 666; *Mill
and Lumber Co.* v. *Hayes*, 76 Cal. 387; *American Preservers'
Co.* v. *Taylor Manf. Co.* 46 Fed. Rep. 152; 9 Am. & Eng.
Ency. of Law, pages 884, 895, 896.

The agreement recites, that it is designed by its sign-
ers to form a trust for the purpose of securing co-
operation in the business of manufacturing preserves,
etc., and of selling and dealing in the same in home and
foreign markets. This co-operation, to be secured through
the extraordinary powers conferred upon the nine trus-
tees named in the agreement six of whom are designated
by name and authorized to elect three others, could not
result otherwise than in a grinding monopoly, control-
ling all trade in the business specified, and raising or
depressing prices therein at the will of the trustees.
Such trustees are empowered to organize corporations
with all or any of the powers specified in the purposes
of the agreement; and the stock of such corporations is
to be issued to or purchased by said trustees. For this
stock the trustees are to issue certificates of trust. The
agreement is to go into effect within sixty days from the
time those, holding the majority of the stock in seven
specified corporations formed or to be formed, shall
transfer the same to the trustees. Each signer of the
agreement agrees to assign and transfer to said trustees
absolutely all the shares, which he may own in said
corporations formed or to be formed, and is to receive
therefor, not money, but trust certificates, equal to the
appraised amount of the earning capacity of his stock as
fixed by the trustees and the stockholder. The trustees
are authorized to purchase in the same way, by the issue
of trust certificates, other stocks of the same companies,
and also the property and business of any firm or indi-
vidual engaged in the business of manufacturing and

dealing in said products. The trustees are to exercise supervision over the corporations whose stocks are transferred to them, and are empowered to elect themselves directors and officers in such corporations, and procure such management of the same as will be conducive to the interests of the holders of the trust certificates. These trust certificates are divided into shares of the par value of $100.00 each, and are prepared by the trustees. They provide, that the holders thereof shall be bound by the terms of the trust agreement and of the by-laws passed in pursuance thereof, and are intended to show the interest of each beneficiary in the trust. The trustees hold the stocks transferred to them in trust for the holders of the certificates, and are to receive and hold the dividends or interest upon said stocks, and are to distribute the same by declaring dividends upon the certificates. The stocks so transferred to the trustees are to be held by them for the benefit of all the owners of the trust certificates. The trust is to continue for twenty-five years, subject to the right of 75 per cent of the holders of the certificates to terminate it after the expiration of one year, and of 65⅔ per cent of such holders to terminate it at the end of five years; and the trustees can not sell or surrender any of the stocks held by them during the continuance of the trust, without the consent of a majority in number and value of the holders of the trust certificates.

It will thus be seen, that the agreement in question makes provision for welding together all the interests, engaged in the business named in the agreement, into one giant combination or partnership under the absolute dominion and control of a board of nine trustees. Its illegal purpose is apparent upon its face, and, therefore, under the decisions above referred to, it must be held to be void as being injurious to the public interest.

The object of the testimony of the defendant, upon the trial below, was to show that the plaintiff, the American

Preservers' Company, was a party to this illegal combination, and that the execution of the bill of sale to it was to enable it to carry out the unlawful designs of such combination. If this testimony as offered had been received, it would have tended to show, not only that the plaintiff company was under the control of this board of trustees, but that it was in a partnership with other corporations. The corporators named in plaintiff's charter and whose names are signed to the agreement therein set out, upon the basis of which they were declared to be a corporation, were trustees in the trust. The court below ruled out testimony, showing that these trustees held stock in more than a dozen different corporations in the different States of the Union, besides the stock in the plaintiff company transferred to it by the defendant and others. The agreement was illegal as providing for a partnership among corporations. It is a violation of law for corporations to enter into partnership. The provisions of the general Incorporation act of Illinois are to the effect, that every corporation organized in this State must manage its own affairs separately and exclusively, and cannot enter into any contract or relation, by which it is divested of such power of exclusive management, or by which its franchises are vested in a partner or any outside board, with equal power to direct its business. (*Whittenton Mills* v. *Upton,* 10 Gray, 582 ; *People* v. *N. R. S. R. Co.* 121 N. Y. 582). The appellee here, a foreign corporation, so far as it was doing business in this State through any control which it assumed to exercise over the business transferred to it by appellant, was subject to the same restrictions and duties as corporations formed in this State, and could have no other or greater powers. (1 Starr & Cur. Stat. page 619, chap. 32, sec. 26). It was, therefore, unlawful for it to be operating in this State as a member of a partnership of corporations. (*State* v. *Nebraska Distilling Co.* 29 Neb. 700 ; *Mallory* v. *Oil Works,* 86 Tenn. 598; *People ex rel.* v. *Chicago Gas Trust Co. supra*).

But it is urged that, even if the trust agreement was illegal in the respects and for the reasons above indicated, yet its illegality could not prevent a recovery in this action of replevin for the alleged reasons, that the motive of parties forming a corporation cannot be inquired into in a collateral proceeding ; that the contract evidenced by the bill of sale was an executed one; and that defendant having received the goods as agent of the plaintiff could not assert a claim adverse to his principal.

It is not necessary to discuss the doctrine contended for by appellee, that, where a corporation, as indicated by its articles of association, is legal, and the incorporation is effected in the manner prescribed by law, the intention of the corporators is immaterial.   The purpose of the offered testimony was to show, that the sale made to the appellee was an illegal sale, and that the bill of sale, upon which appellee relied to show its title and right of possession, was executed to accomplish an unlawful object.   Such proof was entirely consistent with the *de facto* existence and legal organization of appellee as a corporation.   Appellant offered to prove, that he was compelled by Ryan to sign the trust agreement in May, 1888, by the threat, that his business would be ruined by the manufacturers and dealers who had agreed to form the trust; and he swore that he had never heard of appellee until the following July, when Ryan came to him and told him that he must sign the bill of sale to the company, in order to put the stock into the trust.   It may be a serious question, whether there was any real sale of the property described in the bill of sale.   A sale presumes a vendor on one side and a vendee on the other, each having life and existence and the power and ability to contract, and each acting independently and of his own free choice.   But here the vendor, Bishop, and the vendee, the American Preservers' Company, were controlled and directed by an outside force, the trustees named in the trust agreement acting through Ryan, their

representative.   Ordinarily, the vendee becomes owner
and does what he pleases with his own, but, here, the
trust agreement in effect directs the vendee upon what
terms it shall hold the property transferred to it, and
limits the further sale of the same.   Ordinarily, the
vendor fixes the price of what he sells, but, here, the trust
agreement virtually leaves the fixing of the value of what
is sold to the trustees.   The proof introduced showed,
that appellant had nothing to do with arranging for 331
shares of stock in the appellee company as the value of
his property and business, nor did he determine that 662
certificates of trust were a fair equivalent for the stock.
All this was settled and arranged beforehand by Ryan.
(*People* v. *N. R. S. R. Co. supra*).

But if it be assumed, that appellant executed the bill
of sale and submitted himself to the control of the trus-
tees, or of appellee, voluntarily and of his own free will,
then it follows that he was *particeps criminis* with them
in the unlawful venture.   He, as well as appellee, was a
party to the unlawful contract evidenced by the bill of
sale.   If appellee had been an individual, instead of a
corporation, and appellant had executed the bill of sale
for the purpose of defrauding his creditors, it will not be
contended that the bill of sale could be relied upon as a
basis of recovery by either party.

In *Kirkpatrick* v. *Clark*, 132 Ill. 342, the action was
ejectment by the grantee in a deed against the grantor
therein, who was in possession of the premises.   The
defendant offered to show, that the deed had been exe-
cuted for the purpose of defrauding the defendant's cred-
itors, but the evidence was rejected, and we reversed the
case holding that the ruling was erroneous.   In that case,
we applied the maxim *in pari delicto potior est conditio de-
fendentis et possidentis*, and held that, where parties con-
cerned in illegal agreements are *in pari delicto*, the law
will not aid either, but will leave them without remedy
against each other; and it was also there held, that the

above maxim applied to executed transactions as well as to those which are executory, and would be enforced by courts of law as well as courts of equity. "Whatever the parties to an action have executed for fraudulent or illegal purposes, the law refuses to lend its aid to enable either party to disturb." (*Smith* v. *Hobbs*, 10 Me. 71). See also *Craft* v. *McConoughy*, *supra*, and *Halloran* v. *Halloran*, 137 Ill. 100.

In the case at bar, the appellant never parted with the possession of the property. After he executed the bill of sale, he still continued his business the same as before, though subject to the orders and direction of the trust. The beginning of the action of replevin admits his possession, as replevin does not lie against one not in possession. (Wells on Replevin, 77; *Hall* v. *White*, 106 Mass. 599). We see no reason why the doctrine of the *Kirkpatrick* case does not apply here, although the action is replevin and not ejectment, and although the property involved is personalty and not real estate. The bill of sale rests under the ban of the law, as well when executed to carry out the illegal agreement hereinbefore set forth, as if it had been made for the purpose of defrauding creditors. The law will not aid the appellee to recover the property, but will leave both it and appellant where they were when the suit was begun.

Counsel for appellee claim, that, by the bill of sale, appellee became the owner of the property and then turned over the possession of it to appellant under an arrangement by which the latter was to manage it for appellee. Under this view of the case, the agreement, thus made after the sale, was as unlawful as the contract embodied in the bill of sale itself, because appellant thereby agreed to aid in carrying out the illegal purpose of the trust agreement. Letters from Ryan to appellant were introduced in evidence but finally excluded by the court, directing appellant to advance the price on jellies in Chicago so many cents; not to sell at lower prices

without referring the matter to him (Ryan); not to offer
any goods in Indiana; not to go below a certain price,
"but in competition with outsiders  *  *  *  not (to) hes-
itate to make any price that will do the business;" to
send schedules of the stock on hand and estimates of the
fruit needed for the season; how to charge paper given
and received in the course of business; and how to make
entries on the books, etc.    These letters, and other
offered proof, showed that appellant was holding the
property and managing the business under the direction
of the trust and under the instructions of its secretary.

The general rule of law is, that a contract made in
violation of a statute is void, and that, when a plaintiff
cannot establish his cause of action without relying upon
an illegal contract, he cannot recover.    (*Miller* v. *Ammon,*
145 U. S. 421; *Penn* v. *Bornman,* 102 Ill. 523; *Comrs. of
Drainage District* v. *People,* 138 id. 87).    In *Shaffner* v. *Pinch-
back,* 133 Ill. 410, we held that, where two persons con-
tribute money to be used by one of them for the purpose
of betting or wagering the same on horse races, or if
they are partners in the business of betting on horse
races, and the money advanced by the plaintiff to the
defendant is in furtherance of such business, the plain-
tiff cannot recover of the defendant any money so con-
tributed or advanced, upon the ground that betting
money on a horse race is gaming and in violation of law,
and a contract in aid of the offense of gaming is prohib-
ited by statute and void, and no recovery can be had on
it; and we there said, that plaintiff and defendant, being
jointly engaged in a business which was in violation of
law, "were, in respect to such business, *in pari delicto,* and
the law will refuse its aid to assist either, but will leave
them in the positions in which they have placed them-
selves."

Cobbey in his work on the Law of Replevin (sec. 149)
says: "One who has parted with his property under a
contract which is against public policy cannot maintain

replevin for it.   The law will leave the parties in the situation in which they have placed themselves."

In *Stout* v. *Watson et al.* 19 Ore. 251, the action was replevin, and the plaintiff relied upon a bill of sale in the nature of an assignment, which was void under the statute as not being for the benefit of all the creditors; and the court held, that a motion for a non-suit, made by the defendant at the close of plaintiff's evidence, was improperly disallowed, because the plaintiff had no other evidence of title to the property in controversy except the bill of sale, which had been executed in violation of the statute, or contrary to its provisions, and was therefore void.

In *Hutchins* v. *Weldin*, 114 Ind. 80, the action was replevin to recover possession of a horse; plaintiff claimed that he was the owner and entitled to the possession of the horse, and that the defendant had possession of it without right, and unlawfully detained it; there was evidence authorizing the jury to find, that the plaintiff, by an executed contract, had parted with his title to and right to the possession of the horse, but that the contract, although fully executed by the parties thereto, was *contra bonos mores* and void as against public policy; verdict and judgment below were for the defendant, and the Supreme Court of Indiana, in affirming the judgment, said: "The law in such a case will leave the parties just where it finds them.   If the contract has not been executed, it will not be enforced; if it has been executed, the law will not extend relief.   Where a contract void as against sound morals or public policy has been fully executed by both parties, and suit brought under, upon or against such contract, *potior est conditio defendentis.*"

When the issue in an action of replevin is one of title, the plaintiff must prove a title, on which he can base a lawful possession.   (20 Am. & Eng. Ency. of Law, page 1054).

As to the claim that the relation of agent and principal existed between appellee and appellant, we do not think that the existence of such a relation, if it had been found by the jury to exist, would authorize a recovery by appellee, if the facts offered to be proven by the defendant had been established by his evidence.    It may be admitted to be true, as a general principle in the law of agency, that the agent may not dispute his principal's title; but there are exceptions to this general principle. (Mechem on Agency, sec. 525).    The law will not enforce the performance of an agency, which has for its object, or tends directly to promote, the commission of an illegal act, or an act opposed to public policy, such as the creation of fictitious and unnatural values, or the control or monopoly of traffic in the staple articles of commerce, or the prevention of free and natural competition therein. Ordinarily in such case it will assist neither party. (Mechem on Agency, secs. 20, 35).    In illegal transactions prohibited by law, or morals or public policy, an agent cannot recover either for his services, or for his advances and disbursements, nor will the law assist the principal to recover his property or its proceeds.    The guilt of both is deemed to be equal, and the maxim is, *in pari delicto potior est conditio defendentis.*    "Each party is left precisely where he is found at the time of the controversy to bear the burden of his own abandonment of his duty to the law of his country."    (Story on Agency— 8 ed.—secs. 195, 330, 344).

In *Samuels* v. *Oliver*, 130 Ill. 73, where it appeared that a principal had employed an agent to buy and sell grain with the illegal purpose of controlling the market and price thereof, and this fact was known to the agent, we held, that such principal would not be permitted to recover against the agent for moneys received by him in the course of such business; and it was there said: "When the employment of an agent relates to the performance of an immoral or illegal act,    *   *   *   neither party can

make the contract the basis of a suit against the other. Advances for illegal purposes fall within the same rule, and cannot be recovered by the principal of the agent, or the agent of the principal."

There are cases, which hold that, if the contract is founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, it will not be regarded as unlawful. If the promise be unconnected with the illegal act and founded on a new consideration, it will not be tainted by the act. For instance, a principal may recover from his agent money paid to the agent by a third person from whom such money may have been due to the principal upon an illegal transaction, because the contract of the agent to pay the money to the principal is not immediately connected with the illegal transaction. But the law will not assist the principal to recover against the agent, where the contract between them grows directly out of the illegal transaction, and the agent has been concerned in the execution of the illegal transaction and participated in it. The maxim above quoted has application as between the immediate parties to an illegal contract. Here, the offered testimony was for the purpose of showing, that the agent aided and assisted the principal in carrying out the objects of the illegal combination, and was a party to the contract of sale executed in the interest of the illegal transaction, and that the assumed agency, if there was one, had for its object the accomplishment of the unlawful purpose.

We are, therefore, of the opinion that the action of the trial court in refusing to admit the defendant's offered testimony and in excluding that which was admitted, can not be sustained upon any of the grounds urged in support of it, and that, in the rejection and exclusion of such evidence, said court committed error.

Other points, some of them of much force, are discussed by counsel. These relate to the admitted abandonment

of the trust, and defendant's alleged rescission of the contract and attempted withdrawal from the trust, and the trial court's refusal to submit the case to the jury upon such proof as was before them.   We do not deem it necessary, however, to discuss the questions growing out of these other matters, or to pass any opinion upon them. For the reasons above indicated, the judgments of the Appellate and circuit courts are reversed, and the cause is remanded to the circuit court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*