## American Strawboard Company v. The Peoria Strawboard Company.

1. TRUSTS AND COMBINES—*Contracts in Relation to, Void.*—All contracts entered into in violation of the provisions of the act of the General Assembly, approved June 11, 1891, entitled "An act to provide for the punishment of persons, copartnerships or corporations forming pools, trusts and combines, and mode of procedure and rules of evidence in such cases," are absolutely void.

2. SAME—*Recovery of Rent upon Leases in Violation of the Law.*—No recovery of rent can be had upon a lease executed and entered into knowingly, for the purpose of aiding an unlawful conspiracy and combination to limit the production and to enhance the price of an article of merchandise, in violation of the "Act to provide for the punishment of persons, copartnerships or corporations forming pools, trusts and combines, and mode of procedure and rules of evidence in such cases." Approved June 11, 1891.

3. CORPORATIONS—*Effect of Notice to its Officers.*—A corporation can only know things through the knowledge of its officers; whatever information its managing officers have, especially when derived and obtained by them while transacting its business in the line of their authority, is binding upon the corporation.

4. CONTRACTS—*No Recovery When Illegal.*—If a contract is illegal in the first instance, the mere fact that it has been executed gives no right of recovery.

5. PLEADING—*Recovery Under the Common Counts.*—Where a legal contract has been fully executed, and nothing remains to be done but the payment of the money due thereon, a recovery may be had upon the common counts; but this rule has no application to an illegal contract, even though fully executed.

6. PUBLIC POLICY—*Contracts Against.*—Where suit is brought upon an unexecuted contract, void as against sound morals or public policy, the law will not lend its aid, but will leave the parties where it finds them.

7. RECOVERY—*Upon Illegal Contracts.*—Where a plaintiff can not establish his cause of action without relying upon a contract made in violation of a statute he can not recover.

Assumpsit, on a lease for rent. Appeal from the Circuit Court of Peoria County; the Hon. Thomas M. Shaw, Judge, presiding. Heard in this court at the December term, 1895. Reversed, with a finding of facts. Opinion filed June 1, 1896.

Charles Baird and McCulloch & McCulloch, attorneys for appellant.

All contracts restraining the industrial or business freedom of a person are presumed to be void, and the *onus* lies upon those claiming to enforce them to prove their reasonableness. Greenhood on Public Policy, 720; Bishop v. American Preservers' Co., 41 N. E. Rep. 765; Crafts v. McConoughy, 79 Ill. 346; Mitchel v. Reynolds, 1 P. Wms. 181; 1 Smith's Ld. Cas. 173 (367); Alger v. Thatcher, 19 Pick. 51.

A contract which restrains trade within an entire State is a general restraint. Homer v. Ashford, 3 Bingh. 328; Nobles v. Bates, 7 Cowen (N. Y.), 307; Lawson v. Kidder, 10 Barb. 641; More v. Bonnet, 40 Cal. 251; Wright v. Rider, 36 Cal. 357; Taylor v. Blanchard, 13 Allen, 370; Oregon Nav. Co. v. Hale, 1 Wash. Ter. 283.

Whether such presumption is overcome is a question of law. Greenhood on Public Policy, 720; Linn v. Sigsbee, 67 Ill. 81.

And the facts which are relied upon to overcome such presumption must be alleged by way of pleading. Greenhood on Pub. Pol., 721; Lang v. Werk, 2 Ohio St. 52.

All presumptions are against agreements of this nature, and before such a contract can be enforced, it must appear from the pleadings that such restraint is partial and that good reasons appear for entering into such a contract; and a declaration which does not contain these necessary averments, so as to rebut the presumption of law against its validity, is bad on demurrer. Greenhood on Pub. Pol. 721.

Contracts in restraint of trade are invalid, and this is so even when the restraint imposed is partial unless the restraint be reasonable. The test to be applied in determining whether restraint is reasonable or not, is to consider whether the restraint is only such as is necessary to afford a fair protection to the interests of the party in whose favor

it is given and not so much as to interfere with the interests of the public. Mandeville v. Harmon, 42 N. J. Eq. 185.

The law starts out with the presumption that a contract in restraint of trade is void; and it is only by showing that it is good that this presumption will be rebutted. The rule is not that a limited restraint is good, but that it may be good. Contracts in restraint of trade are *prima facie* void. Leake on Contracts, 734; Talcott v. Brackett, 5 Ill. App. 60.

Appellants contended that the restraint imposed by this contract is a general restraint, in that the appellee agrees not to engage directly or indirectly in the manufacture or sale of any kind of paper boards within a radius of one thousand miles of the city of Peoria. The court will take judicial cognizance of the fact that this would include all of the State of Illinois, as no part of the State is beyond the limit of one thousand miles from the city of Peoria. 1 Greenleaf on Evidence, Sec. 6.

It is generally held that a contract not to exercise trade in a particular State is void. Taylor v. Blanchard, 13 Allen, 375; Dunlop v. Gregory, 6 Selden, 241; Peltz v. Eichele, 62 Mo. 171; Dean v. Emerson, 102 Mass. 480; More v. Bonnett, 40 Cal. 251; Wright v. Rider, 36 Cal. 242; Oregon Steam Navigation Co. v. Hale, 1 Wash. Ter. 283; Lawrence v. Kidder, 10 Barb. 641; Western Wooden Ware Association v. Starkey, 84 Mich. 476; Transportation Co. v. Pipe Line Co., 22 W. Va. 617.

The principle upon which these cases is decided is that a contract which is tainted with illegality can not be enforced. The guaranty of a void contract is likewise void. Lawler v. Walker, 18 Ohio, 151; Penn v. Boorman, 102 Ill. 523; Central Transportation Co. v. Pullman Co., 139 U. S. 24; Ford v. Chicago Milk Shippers Association, *supra.*

If any part of the consideration is illegal, the whole contract is void. Toby v. Robinson, 99 Ill. 222; Tenney v. Foot, 95 Ill. 95; Banking Co. v. Rantenburg, 103 Ill. 460.

If the consideration for the payment of rental or any part of it upon the face of the lease is so tainted with illegality that no recovery could be had for the rent, as between lessor

and lessee, the guaranty must fall with the lease. Henderson v. Palmer, 71 Ill. 579; Nash v. Monheimer, 20 Ill. 215; Banking Co. v. Rantenberg, 103 Ill. 460; Rouse v. Mohr, 29 Ill. App. 321.

And if for any reason the guaranty can not be admitted under the special count, it can not be admitted under the common counts, for in all cases the guaranty must be specially pleaded. 1 Archb. N. P. (126) 197; Fell on Guaranty and Suretyship, 20; Potter v. Granbeck, 117 Ill. 409.

A corporation, without a special grant, has no power to guarantee the undertaking of another. The simple act of going security for another is out of the line of any ordinary business. Nat. Park Bank v. Ger. Am., etc., 116 N. Y. 281; Mechanics & Co. v. White Lead Co., 35 N. Y. 505; Lucas v. White Lead Co., 70 Iowa, 542; Madison Pl. Rd. Co. v. Watertown Pl. Rd. Co., 7 Wis. 59; Geneseo Bank v. Patchin, 13 N. Y. 309; Humboldt Co. v. American Co., 62 Fed. R. 356; Tracy v. Guthrie Co. Ag. Soc., 47 Iowa, 27; Green's Brice Ultra Vires, 252; Smead v. J. P. & C. R. R. Co., 11 Ind. 104; Bk. of Geneseo v. Patchin, 13 N. Y. 309; State Bank v. U. S. Pottery Co., 34 Vt. 144; Central Bank v. E. S. D. Co., 26 Barb. 23; Bridgeport Bank v. E. S. D. Co., 30 Barb. 421; Farmers Bank v. E. S. D. Co., 5 Bosw. 275; Morford v. Farmers Bank, 26 Barb. 568.

Stevens, Horton & Abbott, attorneys for appellee.

To sustain an action for use and occupation of real estate, the relation of landlord and tenant must exist between the parties, by agreement, either express or implied. Skinner v. Skinner (Neb.), 57 N. W. Rep. 534.

In an action for use and occupation the plaintiff may resort to the original agreement, though void under the statute of frauds, for the purpose of ascertaining the amount of rent to be paid; and although a special agreement is not declared on, the defendant is not at liberty to give evidence of the value of the premises so as to reduce the recovery below the sum stipulated. Marr v. Ray, 151 Ill. 340.

An action for use and occupation is founded upon contract, express or implied, and the relation of landlord and tenant must exist between the parties. Dudding v. Hill, 15 Ill. 61; Smith v. Stewart, 6 Johns. 46; Ballentine v. McDowell, 2 Scam. 20; McNair v. Schwartz, 16 Ill. 24; Hadley v. Morrison, 39 Ill. 392.

When the terms of a special contract have been so far performed that nothing remains but a mere debt, or duty to pay money, the amount due may be recovered under a general count. Tunnison v. Field, 21 Ill. 108; Adlard v. Muldoon, 45 Ill. 193; Pickard v. Bates, 38 Ill. 40.

The plea of *ultra vires* should not prevail where it would not advance justice, but would accomplish a legal wrong. Whitney Arms Co. v. Barlow, 63 N. Y. 62; Spelling on Corporations, Sec. 766; Morawetz on Corporations, Sec. 693; Chicago Building Association v. Crowell, 66 Ill. 453.

A corporation can not retain property acquired in transactions *ultra vires*, and at the same time repudiate its obligations. Durst v. Gale, 83 Ill. 136; M. & L. R. R. Co. v. Dow, 19 Fed. 388.

When a contract has, in good faith, been fully performed, either by the corporation or other contracting party, the one who has received benefits is not permitted to resist its enforcement by a plea of mere want of power. Beach on Private Corporations, Sec. 425; Bradley v. Ballard, 58 Ill. 413; O. C. & A. R. R. R. Co. v. Penn. Trans. Co., 83 Pa. St. 160.

The doctrine of *ultra vires*, so far as it affects executed contracts, is wanting in principle, and rests upon no solid foundation. The application of the doctrine can be of no service to the State in restraining usurpation or not promoting the public interest, while it encourages dishonesty and sets aside general principles of law, by enabling a corporation to take advantage of its own wrong. Beach on Private Corporations, Sec. 425.

In order that illegality of a contract may be pleaded, it must appear that the illegality inheres in the act or contract sought to be declared illegal. Beach on Private Corporations, Sec. 438.

Rent actually due by the terms of an unauthorized lease of a railroad, may be recovered, and the defendant can not plead *ultra vires.* Peterboro R. R. Co. v. Nashua R. R. Co., 59 N. H. 385; Woodruff v. Erie R. R. Co., 93 N. Y. 609.

If an agreement is legally void and unenforcible by reason of some statutory or common law prohibition, either party to the agreement, who has received anything from the other party and has failed to perform the agreement on his part, must account to the latter for what has been so received. Under the circumstances, courts will grant relief irrespective of the invalid agreement, unless it involves some positive immorality, or there are other reasons of public policy why the court should refuse to grant any relief in the case; and if one of the parties is innocent of any wrong, the court will compel the guilty party to account for whatever he has received under the agreement. These doctrines have been applied repeatedly in suits arising out of contracts entered into by corporations, although prohibited by statute or common law. Morawetz on Corporations, Sec. 721.

A corporation can not avail itself of the defense of *ultra vires* when the contract has been in good faith fully performed by the other party, and the corporation has had the full benefit of the performance and of the contract. The same rule holds *e converso.* Cadisch et al. v. G. C. E. L. & B. Ass'n et al., 151 Ill. 531. See also Kelly v. N. & A. Horse R. R. Co., 141 Mass. 496; Tode v. Gross, 28 N. E. Rep. 469; S. C. N. Y. 127, 480; Leslie v. Lorrillard (N. Y.), 18 N. E. Rep. 363; Oakdale Manufacturing Co. v. Garst, 28 Atl. Rep. 973; Herschoff v. Bontineau (R. I.), 19 Atl. Rep. 712; Moore & H. Hardware Co. v. T. Hardware Co., 41 Ala. 680; Baines v. Gery, 35 Ch. Div. 154.

In cases where the contract is tainted by no illegality, but some of the promises are illegal, the illegality of those which are bad, does not communicate itself to contaminate those which are good, except where, in some peculiarity of the contract, its parts are inseparable. Smith's Leading Cases, Vol. 1, p. 727.

Bonds and other contracts may be good in part and void for the residue, where the residue is founded on illegality; and such doctrine is well founded in the common law, and has been recognized from a very early period. The doctrine has been maintained, and is now settled law, that where the different covenants or conditions are severable and independent of each other, and do not import *malum in se*, the good will stand; that contracts in restraint of trade are divisible and should be given a construction on that theory, if possible. U. S. v. Bradley, 10 Pet. 360; Oregon Steamship Navigation Co. v. Winsor, 87 U. S. 7.

No contracts are void as being in general restraint of trade where they operate simply to prevent a party from engaging or competing in the same business. In determining whether a contract is reasonable such a limit should be laid down as under any circumstances would be sufficient protection to the interests of the contracting party, and if the limit stipulated for does not exceed that, the contract should be held valid. Leslie v. Lorillard (N. Y.) 18 N. E. Rep. 366; Match Co. v. Roeber, 106 N. Y. 473. See also L., N. A. & C. Ry. Co. v. Flanningan et al., 113 Ind. 488; Manhattan Hardware Co. v. Phalen, 128 Pa. St. 110; Wright et al. v. Pipe Line Co. et al., 101 Pa. St. 204; Day v. Spiral Springs Co., 57 Mich. 146; Gaskeel v. King, etc., East, 165; Wigg v. Shuttleworth, 13 East, 87.

The rule generally prevails in America that the bare knowledge of the vendor that the property sold is designed to be applied to a use unlawful, but not amounting to a felony or crime, involving great moral turpitude, will not prevent a recovery based on the sale. Tracy v. Talmage, 14 N. Y. 162; Bickles v. Sheets, 24 Ind. 1; Michael v. Bacon, 49 Mo. 474; Steele v. Kirl, 4 Dana (Ky.) 381; Bishop v. Honey, 34 Tex. 252; McKinney v. Andrews, 41 Tex. 363; Finch v. Mansfield, 97 Mass. 89; Supe v. Woodhall, 113 Mass. 391; Wilson v. Stratton, 47 Maine, 120; Territt v. Bartlett, 21 Vt. 184.

Mere knowledge of the lender of money of the borrower's illegal purpose for getting it, will not prevent a recovery.

Jones v. Bank, 9 Heisk. (Tenn.) 455; Louis v. Alexander, 51 Tex. 578; Howell v. Stewart, 54 Mo. 400; Frolich v. Alexander, 36 Ill. App. 428.

MR. JUSTICE CRABTREE DELIVERED THE OPINION OF THE COURT.

Appellant and appellee are both corporations, organized and existing under the laws of this State.

The action was assumpsit, to recover for rent alleged to be due for the use and occupation of a certain strawboard mill owned by appellee, and situated in the village of Averyville, near the city of Peoria, and also for straw and other material, claimed to have been sold and delivered by appellee to appellant. The suit was originally commenced to the February term, 1894, and the common counts only were filed. Subsequently, and after the expiration of the lease hereinafter referred to, an amended declaration was filed and another suit commenced, but this latter suit was, by agreement of parties, dropped, and the original suit was prosecuted the same as if begun at a later date; the *ad damnum* and summons were changed and increased to cover the entire amount, and thereafter the case proceeded the same as though the suit were commenced after the expiration of the term mentioned in the lease, and the contract accompanying the same, which will be hereafter more particularly referred to.

On May 7, 1894, an additional count to the declaration was filed, setting out a lease of the premises in question by appellee to the Independent Paper Company, (also an Illinois corporation,) a guaranty of the lease by appellant, and an assignment thereof by the Independent Paper Company to appellant.

The appellant filed various pleas, the principal defense being set out in the fifth, sixth and seventh, which in various phraseology, allege that the lease and contract in question were not made in good faith, with the intent and purpose of passing to the lessee, the Independent Paper Company, the possession of the premises therein described, but on the contrary the same were adopted by the appellee and said

Independent Paper Company, as a shift and device to conceal and cover an unlawful purpose and transaction in this, to wit: " That at the time of the making and execution of said instrument in writing, the said plaintiff and the said Independent Paper Company were respectively corporations organized and doing business under and by virtue of the laws of the State of Illinois, in manufacturing, producing and selling an article of merchandise, to wit, strawboards, and that said instrument in writing was made, executed and delivered within the said State of Illinois; that the said plaintiff and the said Independent Paper Company had then and there entered into and were then and there parties to, an unlawful agreement, combination, confederation and understanding between themselves and divers other corporations, partnerships, individuals and associations of persons engaged in the same or like business, to fix and regulate the price, and to fix and limit the amount and quantity of said article of merchandise, to wit, strawboards, to be manufactured, produced and sold in the State of Illinois; that the said instrument purporting to be a lease was made and entered into with the intent of carrying into effect the purposes of said unlawful agreement, combination, confederation and understanding by causing the said plaintiff to cease operating its said strawboard plant and thereby to restrict and limit the production of strawboard during the continuance of said lease, and that as a bonus for its ceasing to operate its said plant, the said Independent Paper Company was to pay, under the name of rent for said premises and property, the sum of four thousand five hundred and fifty dollars per month as provided in the said instrument in writing; and said defendant avers that in pursuance of said unlawful intent as aforesaid, the said plaintiff did, during the whole of the term mentioned in said instrument in writing, continue in the possession of said premises, and did not deliver the possession thereof to said Independent Paper Company or to said defendant."    And said pleas aver that the contract of leasing was void.

We have quoted largely from the seventh plea, in order

that the defense thereby sought to be set up may fully appear; the fifth and sixth plea substantially interpose the same defense.

On the trial the lease and additional contract were admitted in evidence by the court, over many objections of appellant which appear in the record, and exceptions were duly saved to the rulings of the court on the question of their admissibility, and error is assigned thereon.

At the close of plaintiff's evidence, appellant made various motions as to the exclusion of certain evidence, and also moved the court to direct a verdict for defendant, except as to the sum of $181.73, which motions were overruled by the court and exceptions saved to such rulings, and error is assigned thereon. The motion of appellant to direct a verdict for defendant was renewed at the close of all the evidence, but refused by the court, exceptions saved, and error is assigned as to such ruling of the court.

After the evidence had been closed and the arguments in the case partly made, the plaintiff asked and the court granted leave to file an additional count for rent in arrears and for use and occupation, to which ruling appellant excepted and error is assigned on this action of the court.

There was a verdict in favor of appellee for $32,266, and motion for a new trial. Appellee entered a *remittitur* for $4,374.98, and thereupon the court overruled the motion for a new trial and entered judgment in favor of appellee for $27,881.02 damages, and for costs, and the defendant appealed to this court.

Various errors are assigned upon the record, some of which have been already mentioned, and in addition thereto it is insisted the verdict is manifestly against the weight of the evidence, and that the court erred in overruling the motion for a new trial. If this point is well taken, a consideration of the other assignments of error would be unnecessary. If, to prove its case, the appellee must have resort to and place reliance upon the written lease and contract read in evidence, then the pleas of appellee setting up their illegality under the anti-trust law of 1891 would, if proven, constitute a complete defense to the action.

The law provides as follows :

Sec. 1. "If any corporation organized under the laws of this or any other State or country, for transacting or conducting any kind of business in this State, or any partnership or individual or other association of persons whatsoever, shall create, enter into, become a member of or a party to, any pool, trust, agreement, combination, confederation, or understanding with any other corporation, partnership, individual, or any other person or association of persons, to regulate or fix the price of any article of merchandise or commodity, or shall enter into, become a member of, or a party to, any pool, agreement, contract, combination or confederation, to fix or limit the amount of any article, commodity, or merchandise to be manufactured, mined, produced or sold in this State, such corporation, partnership or individual, or other association of persons, shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to indictment and punishment as provided in the act."

Sec. 5. "Any contract or agreement in violation of any provision of the preceding sections of this act, shall be absolutely void."

Sec. 6. "Any purchaser of any article or commodity from any individual, company or corporation transacting business contrary to any provision of the preceding sections of this act, shall not be liable for the price or payment of such article or commodity and may plead this act as a defense to any suit for such price or payment." 3 Starr & Curtis, 347.

It is to be observed that this law is broad and sweeping in its terms, and in language not to be misunderstood places the seal of legislative condemnation and prohibition upon all combinations, confederations and agreements, between corporations and individuals, having for their object the limiting of production and the enhancement of price, of all merchantable commodities. Not only are severe penalties provided for a breach of the law, but contracts made in its violation are declared void, and even when goods have been sold and delivered by a corporation or individual doing busi-

ness contrary to the provisions of the act, no action may be maintained for the price thereof. Were the lease executed by the appellee to the Independent Paper Company, the guaranty thereof by appellant, and the agreement for additional rent made between appellee and appellant, October 10, 1892, all parts of a scheme and device entered into between appellee, appellant, the Independent Paper Company and a number of other corporations and individuals, for the purpose of limiting the amount of the production and enhancing the price of strawboards, as alleged in appellant's fifth, sixth and seventh pleas? If this question be answered in the affirmative, then, under the view we take of the case, there can be no recovery, and the judgment must be reversed.

We have given the evidence that careful and thorough examination and consideration which the importance of the case demands and is entitled to receive, and we think the following facts are established, viz.:

In 1892, prior to the making of the lease and contract in question, the American Strawboard Company (appellant) was engaged in the business of manufacturing and selling strawboard and paper, owning or controlling nineteen or more active plants engaged in such manufacture in different portions of the United States. Its capacity for production of strawboard in October, 1892, was upward of 400 tons per day. There were at that time some thirty-six or more other plants in the United States engaged in the manufacture of strawboard, having a combined capacity of over 300 tons per day; these last named plants were known as "independent mills," and were not owned or controlled by appellant.

Prior to July, 1892, there had for some time existed a combination or agreement between the owners of these independent mills, the details of which do not clearly appear, but the evident intention of which was to restrict production and maintain prices of strawboard; and this object seems, to some extent at least, to have succeeded, until about July 1, 1892, when prices commenced to decline rapidly,

and the persons interested in the manufacture of strawboard began to devise means whereby prices could be maintained.

The Peoria Strawboard Company (appellee), was one of the largest manufacturers among the independent mills, having a capacity of from twenty-eight to thirty tons per day. Of this company W. H. Binnian was president, and E. C. Foster, secretary; these two gentlemen, together with Mr. Stone, constituted the board of directors and only stockholders of the corporation. Among other schemes devised for the purpose of maintaining prices by the operators of these independent mills, was the organization of a corporation called the "Independent Paper Company," with an alleged capital stock of $25,000 divided into 2,500 shares of $10 per share, its specified object being "the manufacture, purchase and sale of all kinds of paper, strawboard and paper manufacturers' supplies," the location of its principal office being at Chicago, Cook county, Illinois.

The certificate of incorporation of this company bears date July 7, 1892. The largest stockholder in this company was E. C. Foster, the secretary of appellee, and he became the vice-president and one of the directors of the new company. Mr. John W. Daniels, one of the directors of the Independent Paper Company, testifies that the stock of that company was apportioned according to the tonnage or producing capacity of the mills which the subscribers represented. The Peoria mill having the largest producing capacity of any mill represented in the Independent Company, Foster, its secretary, who appears to have been there representing it, subscribed for 631 shares amounting to $6,310; the highest other subscriber being Hugo Schumacher, representing two mills at Marseilles, Illinois, known as the "Illinois River," and the "Crescent Paper Companies," whose subscription was 451 shares or $4,510 of the capital stock of the Independent Paper Company. While Mr. Binnian swears that Foster in his relations to, and subscription for stock in, the Independent Paper Company, was acting only for himself, and without authority to act for appellee, it is noticeable that Mr. Foster himself nowhere

denies or contradicts the testimony of Daniels, that his sub-scription to the stock of the Independent Paper Company was based upon the tonnage or producing capacity of the Peoria mill, as compared with that of the other mills or companies represented in the scheme. Nor does it appear how Foster could have any interest in the organization of the Independent Paper Company, or what benefit it could be to him or any of the other incorporators or stockholders, except as the mills or companies they represented might be benefited by its ability to maintain or control prices, or limit the production of strawboard. So far as the evidence shows, the only strawboard mill in which Foster had any interest was that of appellee. The Independent Paper Com-pany, as appears by the evidence, never engaged in any busi-ness, never owned a mill or manufactured or sold a pound of paper or strawboard, and never owned a dollar's worth of property, except some assessments upon its capital stock subscriptions, the funds arising from which appear to have been used in paying mills to shut down and cease to manu-facture strawboard, so as to limit production. In fact we think the evidence shows that the whole object and design the parties had in the organization of this Independent Paper Company, was one of a number of schemes devised for the purpose of limiting the production, and enhancing the price of strawboard.

Notwithstanding the efforts made to maintain them, how-ever, the prices of strawboards in the market continued to decline after July 1, 1892, and various meetings were held by the parties representing the independent mills to devise means for maintaining prices, some of which meetings were attended by Binnian, president, and Foster, secretary of appellee, while other meetings were attended by only one of them, but if we are not mistaken, the evidence shows that one or the other of them attended each meeting.

The first meeting was held at Indianapolis, at which Fos-ter was present. Mr. Swinnarton, vice president and gen-eral manager, was also present at that meeting, to confer with the owners and representatives of the independent

mills, but nothing was accomplished. Another meeting was called by the executive committee of the Independent Paper Company, and held at the Weddell House, in Cleveland, O., September 6, 1892. Mr. Swinnarton, vice president of appellant, was invited to be present at that meeting in a letter addressed to him by said executive committee which we deem of sufficient importance to quote, as showing what had been done, and was being done, by the manufacturers of strawboard in the United States, for the purpose of limiting production and keeping up prices. The letter is as follows:

"PIQUA, OHIO, September 2, 1892.

Mr. J. H. Swinnarton, Chicago, Illinois.

DEAR SIR: Your telegram to Mr. Spaulding just received here. We are very much surprised at the position you take, as you will find if you look over the papers we have submitted to you, that the independent mills have paid $19,041.50 against the American $11,700 up to July 1st. We have thus paid almost $2 to your $1, which amounts to nearly $4 per ton on the amount of board sold by the independent mills at new prices against $2 per ton, on a low estimate of sales, by your company. Since July 1st you have paid $8,500, and the independent $5,000. You will see by these figures that the independent mills have not shirked their proportion of the amount paid, nor had we expected to do so; but when you ask us to pay for St. Mary's, Crosby, Morris and others, you are asking an impossibility; but we expect to pay our proportion with the American of all the expenses, but can not be held responsible for the failure of others, because the independent mills who are willing to pay, are no more responsible for those who refuse to co-operate than is the American. Clark's offer to close down the Illinois River Paper Company, and his belief that he could immediately terminate the troublesome contract made by the Crescent, and Foster finally offering to run on half time, puts the tonnage in better shape than ever before. We should regret very much to see you persist in your present position, which will undoubtedly overthrow all the work

that has been done.  We do not feel as though we could accept your position.  The executive committee have called a ·meeting of the manufacturers to be held at the Weddell House, Cleveland, for Tuesday afternoon, September 6th.  It would save much time if you would be present in the city or near at hand, as there will undoubtedly be necessity for consultation.  Mr. Spaulding leaves this evening and will be in Niles after to-morrow noon and until Monday.

Yours truly,<br>
J. F. Spaulding,<br>
John W. Daniels,<br>
Of Executive Committee."

In response to this invitation Mr. Swinnarton attended this meeting at Cleveland, at which there was a large representation of the owners of the independent mills.  After a couple of days' conference, during which nothing was accomplished, a committee of the owners of the independent mills called upon Mr. Swinnarton for his advice and assistance. Being informed of the situation, and that the owners of the independent mills were unable to arrive at any conclusion or agreement, Mr. Swinnarton made the proposition that if the independent mills would reduce their production to 100 tons per day, and if the producers of that 100 tons per day would agree to maintain prices until January 1, 1894, as they were prior to July 1, 1892, he would undertake to finance the scheme and pay whatever might be necessary to restrict the production to 100 tons, if the amount required to do so were fair and reasonable.  The owners of the independent mills thereupon went to work through a committee to see whether they could restrict the production of the independent mills to 100 tons per day, and several meetings were held for that purpose.  Mr. Foster (the secretary of appellee) was a member of this committee and was active in the endeavor to ·carry out this scheme.  A short time afterward a meeting was held in Chicago, at which it would seem, after several days' conference, a definite plan of action was adopted, and the owners of the independent mills, not then represented, were notified that

unless production were at once curtailed the prices would
be cut.  Soon after October 1, 1892, another meeting of
the owners of the independent mills was held at Chicago,
at which Mr. Binnian (the president of the appellee) was in
attendance.  About October 6th Mr. Gurley, the attorney
for the Independent Paper Company, was called into the
meeting held on that day, and suggested as a plan for carry-
ing out the proposition made by Mr. Swinnarton, at Cleve-
land, that the owners of the independent mills, which were
to shut down in whole or in part, should execute leases to
the Independent Paper Company, by which they would, in
form at least, lease their mills or part of their capacity to the
Independent Paper Company; that there should be indorsed
upon these leases a guaranty of the performance of their
terms and conditions, to be signed by the American Straw-
board Company (appellant), and that assignment of the
leases so guaranteed should be made by the Independent
Paper Company to the American Strawboard Company.
This plan was quite generally agreed to by the parties pres-
ent, and efforts were then directed to securing a reduction
of the production of the independent mills to 100 tons per
day, so as to meet the requirements of Mr. Swinnarton's
proposition.  But it was found impossible to arrange for a
production on the part of the independent mills of less than
115 ¼ tons per day, and Mr. Swinnarton being called into
the meeting was asked to accept this amount of tonnage in-
stead of the 100 tons named in his proposition.  This he at
first refused to do, but subsequently a committee, of which
Foster (secretary of appellee) was one, called upon Mr.
Swinnarton and submitted to him a statement which ap-
pears in the evidence as exhibit " I," containing a list of
thirty-six mills, their total capacity, the amount of capacity
which was to be leased or shut down, and the price per ton,
and amount per day they were to receive for shutting down
or leasing their capacity, whichever it may be called.  This
statement shows that the production of the independ-
ent mills could not be reduced below 115.87 tons per day,
and the committee informed Mr. Swinnarton that after all

efforts made it was impossible to reduce the production below those figures.

As we have said, Mr. Foster, the secretary of appellee, was a member of this committee, and the statement showed the Peoria mill, with a capacity of twenty-eight tons per day was to be entirely shut down at a price of $6.50 per ton, or $182 per day. Mr. Swinnarton finally acceded to the request of the committee and wrote upon the statement the word "accepted."

According to the testimony of Swinnerton, the date of this acceptance was October 15, 1892. He says the date of the meeting with the committee was October 12th, and that they were in session Saturday, Sunday and Monday, and that he wrote the word " accepted " on Monday, when there was an agreement made to sign the leases. Forms of leases were prepared by Mr. Gurley, attorney for the Independent Paper Company, and submitted for approval, and most of them were executed by the owners of mills represented, who were then present, but those for the eastern mills were taken by Mr. Spaulding, who was to procure their execution, while for the same purpose Mr. Foster took those prepared for the Vincennes and Chillicothe mills. We think the evidence shows that Mr. Binnian was present in Chicago, attending the meetings of these mill owners and representatives from October 6th to about October 17th, or until the lease in question was delivered to Mr. Gurley, which was near the latter date. He testifies that he was a silent listener to what took place at these meetings and took no active part in them, but Mr. Swinnarton thinks he remembers that Binnian was present and made a speech at one of the meetings. That Foster was an active participant at all of the meetings, or most of them, and took a leading part in assisting to engineer the scheme, which resulted in the formation of a combination to limit the production and enhance the price of strawboards, is nowhere denied. It is claimed, however, by Binnian, that in these matters Foster did not represent appellee, and had no authority so to do. Whom did he then represent, and how did it come about, that in the statement submitted to Swinnarton, the Peoria mill, with a capacity of twenty-

eight tons per day, was to be shut down? It is quite clear without that being done, the whole scheme would have fallen through. That leases of some nineteen or twenty of the mills mentioned in that statement, were executed to the Independent Paper Company and deposited with Mr. Gurley can not be denied. That immediately afterward the price of strawboard advanced $10 per ton, is admitted. That the mills leased, or the amount of capacity mentioned in the respective leases, were shut down and thereby reduced the production of strawboard to the extent of the agreement, can not be questioned.

The unlawful conspiracy and combination to limit production and enhance prices was accomplished, as we think, in direct violation of the law of this State above quoted. To say that Mr. Binnian, the president of appellee, did not know of this unlawful combination, and that the making of the lease by his company to the Independent Paper Company, its guaranty by the appellant, and the assignment thereof by the Independent to appellant, the same as was done with all the other leases executed under the agreement, were not all parts of, and necessary things to be done in carrying out this scheme, is to pay a very poor compliment to his intelligence. The evidence satisfies us, notwithstanding his somewhat evasive testimony to the contrary, that he knew the whole scheme was an unlawful one, the only hesitation on his part being, how to evade the law, and make a contract which would not be obnoxious to its penalties. We think that as early as June 3, 1893, he was informed of the strained conditions surrounding the manufacture and sale of strawboard, and was willing to do his part toward keeping up prices. This fully appears from his letter of that date to Mr. Swinnarton, which, though adding to the length of this opinion, it may not be amiss to quote. It is as follows:

" PEORIA, ILL., June 3, 1892.

J. H. Swinnarton, Esq.,
Pullman Building, Chicago, Illinois.

DEAR SIR: Replying to your valued favor of the 2d inst. just received, beg to say that much of the information

therein contained is news to me.  I knew that the situation was somewhat strained in some few quarters but supposed that peace and harmony prevailed in general, to a very great extent.  I have had but very little conversation with Mr. Foster since his return from the Chicago meeting and have not a very clear understanding or idea of the proposed corporation.  As I wired you this a. m. Mr. Stone and I stand exactly where we have all along, and where we always expect to be found.  The position we take is, that we want the market upheld, will do all in our power to sustain it, and are perfectly willing to pay our proportion of the expense that this procedure must necessarily entail.  I believe with you that the odium of advancing prices has already ceased to exist, and that some satisfactory basis can be reached whereby all mills will join each other in sustaining the market.  There are, of course, a number of minor points to be considered, which we may talk over when I see you next Monday.  Mr. Ben Spaulding, of Boston, is here to-day, and I am to have a conference with him and Mr. Foster this evening, at which time I will endeavor to strengthen our position with the Spaulding outfit.  Thanking you kindly for bringing this matter more clearly before me, I beg to remain,

Yours truly,

W. H. Binnian."

It thus appears that Binnian was in conference with Swinnarton, Foster and Spaulding as to means to be adopted for keeping up prices, the three persons named being among the principal parties who engineered the unlawful combination subsequently formed.

Knowing that the scheme devised in Chicago, providing for the leasing of the independent mills to the Independent Paper Company, was part of an unlawful combination, he sent for his attorney, Mr. Stevens, to come to Chicago and assist him in making the deal so as to evade the law.  This, of course, neither Binnian nor Stevens testified to, but we think the evidence and circumstances show that such was the object.  Foster also came to Chicago to assist Binnian

in making the arrangement. Binnian was informed by
Stevens that he could not lawfully make a lease of his com-
pany's plant to the Independent Paper Company, but that
if done in good faith, he could lease directly to the Ameri-
can Strawboard Company, just the same as he would have
the right to lease a house. Binnian then knew, if he had
not known before, that the whole scheme was a fraud upon
the law and was invalid. To avoid the consequences, he
endeavored to have the lease run directly to the American
Strawboard Company, as if it were an independent matter
not connected with the leases of the other outside mills to
the Independent Paper Company, but he says that for pur-
poses of his own, Swinnarton wanted the lease to run to the
last named company, and it was finally executed that way,
Swinnarton and Binnian having in the meantime concluded
a contract by which a larger proportional rental should be
paid for the Peoria plant than was agreed to be paid for
the others, to wit, $450 per month additional to that pro-
vided for in the lease, and whereby all material on hand for
the manufacture of strawboard by the Peoria mill was pur-
chased by appellant, and it (appellant) agreed to receive all
material contracted for, and to carry out and fulfill all con-
tracts previously made by appellee for the sale and delivery
of strawboard at the prices specified. This agreement was
in writing and appears in the evidence. The lease was exe-
cuted on the part of appellee by Binnian, its president, and
Foster, its secretary, under the seal of the company, and
after being guaranteed by appellant, and assigned to it by
the Independent Paper Company, the lessee, it was deliv-
ered, with the other leases executed by the outside mills
in the combination, to Gurley. Daniels swears that Bin-
nian was present when he (Daniels) signed the leases as
secretary of the Independent Paper Company; that they
went together to the office of Mr. Gurley, who was to hold
the leases; that Binnian, Spaulding and Gurley checked
over the leases, and that Gurley then said the trust laws
of Illinois were very severe, and that it would be best not
to have the leases all over the country, "as it might get us

(them) into trouble." So the leases were left in Gurley's hands, but either party could have access to them while in his possession. The outside agreement between appellant and appellee, for additional rental, was not left with Gurley, as it appears to have been the understanding between Binnian and Swinnarton that such agreement should be kept a secret from the other parties who entered into the combination. Swinnarton testified that when he and Binnian were negotiating about the disposal of the supplies of the Peoria Strawboard Company, and the papers were executed, it was distinctly stated by Binnian that the contracts, or leases, should not take effect unless the whole scheme was put in effect. It is true that Mr. Binnian contradicts this testimony, but, in view of all the facts in the case, we are inclined to believe that the understanding was that each individual lease was a part of the general scheme to form an unlawful combination, and unless all the leases became operative none of them would do so, because all were necessary to come up to the final proposition of Swinnarton, that the production should be reduced to 115.25 tons per day.

From all the evidence in the case we are entirely satisfied that the scheme into which all these parties entered, and which resulted in the execution of these various leases to the Independent Paper Company, their guaranty by and assignment to the appellant, was a mere shift or device, gotten up for the purpose of limiting the production of strawboard and fixing its price, in violation of the laws of this State. We think Mr. Binnian and Mr. Foster, president and secretary of appellee, both knew of the unlawful combination and its object. That the lease was not made in good faith, with the expectation that either the Independent Paper Company or the appellee were going to use or occupy the plant pretended to be leased, but that it was a mere form adopted to evade the law, and to enable appellee to receive a *bonus* of $5,000 per month for shutting down its mill, allowing the same to remain idle, and thereby taking out of the market the production of from twenty-eight to

thirty tons of strawboard per day. The lease and agreement are of themselves strong corroborating evidence that such was the purpose of the parties to them. By the lease, the lessor assumed all risks from fire or other inevitable accident. It was to bear the expense of all repairs but the capacity of the property was not to be increased during the demised term. The property was to be guarded and protected at the expense of the lessor. The fifth clause was as follows:

"That said lessor shall not be engaged either directly or indirectly in the manufacture or sale of any kind of paper boards within a radius of one thousand miles of the city of Peoria."

By the outside contract appellant agreed to purchase from appellee at cost prices, all raw material on hand at appellee's plant, "including all raw material and supplies of every kind used in connection with the manufacturing business carried on at said plant, and to pay cash for the same within ten days" from the date of the agreement, and further agreed and bound itself to remove all straw on the premises on or before the first day of January, 1893. And appellant further assumed all contracts of appellee outstanding, whether for the sale of the manufactured product or the purchase of straw.

Now this agreement shows very plainly on its face that it was not within the expectation or contemplation of the parties that the plant should be operated by any one for the manufacture of strawboard, because the raw material necessary for its production was all to be shipped away, and the evidence shows that directions were at once given by Swinnarton as to where it was to be sent. In fact the carrying out of this agreement as to shipping straw away from the Peoria mill was begun immediately; so there can be no question that the intention of the parties was, that appellee's mill should be shut down and cease further manufacturing of strawboard during the term of the pretended lease.

It was understood by the parties that the mill might run until November 1, 1892, which it did, and then shut down,

and it was never started again by any one until after the expiration of the time mentioned in the lease. There is no proof that any officer of, or any person representing, the Independent Paper Company, or the appellant, ever took possession of the Peoria plant or ever went near it. The keys to the property were carried by the watchman employed by appellee, and we think in law, the possession remained in appellee. Binnian himself testifies that the only possession given appellant was the delivery of the papers. The attempt to show a possession in appellant because some of the straw was allowed to remain on the premises, we think is not of sufficient importance to warrant the taking of time in its discussion. No more possession was taken of the straw than of the premises on which it was situated and a mere agreement to purchase the straw could not transfer the possession.

· If we are correct in the conclusion that the scheme entered into by Binnian and Foster with Swinnarton, Spaulding, Daniels and others, was an unlawful one, adopted as a shift and device to evade the law against trusts, pools, and combinations, then there can be no question that the knowledge of Binnian, as president, and Foster, as secretary, of appellee, is the knowledge of appellee itself, and a contract made by them under such circumstances, in its behalf and for its benefit, would be as invalid as if made for themselves in their individual capacity. A corporation can only see and know through the eyes, information and intelligence of its officers. And whatever information its managing officers have, especially when derived and obtained by them while transacting its business in the line of their authority, must be held to bind the corporation. Here, the information possessed by Binnian and Foster was obtained while transacting the business of the company, in their official capacity as president and secretary, they being also two of the three only stockholders, and the contract made being for the benefit of the company they represented. We deem it unnecessary to cite authorities to show that under these circumstances appellee was chargeable with the knowledge of its officers. But not

only was there the knowledge on the part of Binnian and Foster as to the illegal nature of the combination entered into between appellant, the Independent Paper Company and the other parties engaged therein, but the evidence satisfies us that it was their intention, by the contract in question, to enable the conspirators to carry out to a successful issue their unlawful purpose, which could not be accomplished without the co-operation of the parties controlling the Peoria plant, shutting off its production of twenty-eight tons of strawboard per day, and thereby reducing the production of the independent mills to 115.25 tons per day, so as to comply with Swinnarton's proposition.

It is insisted by appellant that the lease was rendered void by the provision contained in the sixth clause, whereby the appellee agreed not to manufacture or sell any kind of paper boards within a radius of 1,000 miles of the city of Peoria; the contention being that it was against public policy as an unreasonable restriction in restraint of trade, and that it was error on the part of the court to receive it as evidence, without proof being first made by appellee, to show that the restriction was not in fact unreasonable, although upon its face it might appear to be so. Under the view we take of this case, we do not deem it necessary to discuss that proposition. We prefer to put our decision upon broader grounds, and hold that the contract is void because it was entered into knowingly and purposely as a part of an unlawful combination for the purpose of limiting the production of an article of merchandise and fixing the price thereof, in violation of the plain terms of the statute which we have already cited. If we are correct in our conclusions of facts—and a careful examination and re-examination of the evidence has satisfied us that we are—then there can be no question as to the results which follow. The statute declared the contract void. Under such circumstances the courts will not aid either party, but will leave them where they are found. Bishop v. American Preserving Co., 41 N. E. 765. Counsel for appellee say in their brief: " The theory of appellee, in the prosecution of the

suit, was complete execution of the contract, and nothing remaining to be done but the payment of the money." Even if this theory were sustained by the evidence, we fail to see how it in any way aids appellee. If the contract were illegal in the first instance, the mere fact that it has been executed gives no right of recovery. There is no doubt that where a legal contract has been fully executed, and nothing remains to be done but the payment of the money due thereon, a recovery may be had upon the common counts; but we think this doctrine has no application to an illegal or void contract even though fully executed. Such was the express holding in Hutchins v. Weldon, 114 Ind. 80; S. C., 15 N. E. 804. A contract void as against public policy, was relied upon because it had been executed, but the Supreme Court of Indiana say in reference thereto: " The law in such case will leave the parties just where it finds them. If the contract has not been executed, the law will not extend relief. When a contract, void as against sound morals or public policy, has been fully executed by both parties and suit brought under, upon, or against such contract, *potior est conditio defendentis.*" Bishop v. American Preserving Co., *supra.*

We think this doctrine is sound, and fully applicable to the case at bar. The illegal contracts were a necessary part of appellee's case. They were put in evidence to establish its right to recover, and it is difficult to see how it could prove its case without resorting to them. " The general rule of law is, that a contract made in violation of a statute is void, and that, when a plaintiff can not establish his cause of action without relying upon an illegal contract he can not recover." Bishop v. American Preserving Co., *supra;* Miller v. Ammon, 145 U. S. 421.

The claim of appellee, that it has a right to recover for use and occupation, without resorting to the contracts, we regard as equally untenable. There was in fact no use and occupation, as we have already seen, either by appellant or the Independent Paper Company. The form of action resorted to can not divest the entire transaction of its illegal

character. To allow the appellee to recover in this case, either for use and occupation or upon the ground that the contract has been fully executed, would be to practically nullify the statute, and enable parties, by resorting to mere forms, shifts and devices, to accomplish indirectly what they have no lawful right to do directly. We think the courts should endeavor to assist the legislature in its efforts to suppress pools, trusts and combinations which tend to create monopolies and inflict great injury upon the people.

We do not deem it necessary to discuss the various questions raised upon the pleadings, nor to consider whether or not the court erred in allowing the new *count* to the declaration to be filed during the trial, nor the further question as to whether there was error on the part of the court in giving and refusing instructions. Upon the broad ground that the contracts were illegal and void, and that the whole transaction was an attempt to evade the law and form a combination for the purpose of limiting production and fixing the price of a merchantable commodity in clear violation of the terms of the statute, we hold that there can be no recovery, and therefore the judgment is wrong and should be reversed. Judgment reversed.

### FINDING OF FACTS.

Finding of facts to be made a part of the judgment of this court:

We find that the lease and contract read in evidence were a mere shift or device to evade the law against trusts, pools and combinations to limit and fix the amount of production and fix the price of a merchantable commodity to be produced and sold in this State. That said lease and contract were not made in good faith, for the purpose of transferring the possession of appellee's strawboard plant to the Independent Paper Company or to appellant, but were part of a device adopted whereby, under the form of a lease, appellee was to receive under the name of rent a bonus of $5,000 a month for permitting its said plant to remain idle and cease the production of twenty-eight tons of strawboard per day.

That Binnian, the president of appellee, and Foster, its secretary, both knew of the illegal combination and confederacy formed between the owners of independent mills, the Independent Paper Company and the appellant, for the purpose of limiting the production and fixing the price of strawboard, and that they actually participated in the formation of such combination and confederacy and entered into the lease and contract as officers of appellee, in its behalf, knowingly and intentionally, for the purpose of evading the law, and that without their aid and co-operation on behalf of appellee, such unlawful combination or confederacy could not have been successfully formed.

We further find that neither the Independent Paper Company nor the appellant ever had the possession, use or occupation of appellee's strawboard plant at Peoria, but that such possession remained at all times during the pretended demised term, in appellee, its employes, officers or agents, and during all said time remained shut down and idle, so far as the manufacture of strawboard is concerned.